431 So.2d 372 (1982)
STATE of Louisiana
v.
Alfred B. SHAPIRO.
No. 81-KA-1905.
Supreme Court of Louisiana.
July 2, 1982.
On Rehearing April 4, 1983.
Concurring Opinion April 14, 1983.
Rehearing Denied June 3, 1983.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Edwin O. Ware, Dist. Atty., David Miller, Asst. Atty. Gen., Patrick Quinlan, Asst. Dist. Atty., for plaintiff-appellee.
J. Michael Small, Kathrine S. Williamson, Alexandria, for defendant-appellant.
BURRELL J. CARTER, Justice Ad Hoc.[*]
Alfred B. Shapiro was charged by indictment with second degree murder in violation of LSA-R.S. 14:30.1. After trial by jury, defendant was found guilty. The trial court sentenced defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. On appeal, defendant relies on nine assignments of error for reversal of his conviction and sentence. Originally, defendant had ten assignments of error, but he has abandoned Assignment of Error No. 1 and a part of his supplemental motion for new trial referred to in Assignment of Error No. 10.

FACTS
On November 25, 1979, at about 2:30 a.m., Lavonna D. Ryland was fatally *373 wounded from a gunshot wound to her face. The shot was fired from a .38 caliber revolver which had been purchased by Shapiro. The incident occurred in the defendant's residence after an earlier altercation at the hospital between Ryland and Shapiro. Other than the defendant, there were no eyewitnesses to the shooting. Shapiro claims that Ryland either shot herself accidentally, or committed suicide. The defendant's version of the shooting incident was that after Ryland's sister and the sister's husband had left, he had gone outside the house to move his car into the carport, since it was raining. When he opened the door to re-enter the house, he heard his back bedroom door open. He then saw Ryland about two to three feet from the doorway of the bedroom, holding the revolver to her head with the hammer cocked. According to Shapiro, the gun then went off. At first he claimed Ryland intentionally shot herself, but later said the pistol may have been fired accidentally. The prosecution presented a different version of the shooting incident, claiming that Shapiro had a specific intent to kill or to inflict great bodily harm on the victim by shooting her with the pistol, which was apparently accepted by the jury.

ASSIGNMENT OF ERROR NO. 1
In this assignment, appellant had urged that the trial court had erred in denying his pretrial request that the State furnish the defense with a list of witnesses which the State intended to call at the trial. This assignment has been abandoned by the appellant.

ASSIGNMENT OF ERROR NO. 2
By this assignment, defense argues that the trial court erred in denying the defendant's motion to suppress his inculpatory statements of November 25, 1979, and February 18, 1980. Defendant contends that the inculpatory statements were not voluntary because "he was in such a drugged condition that he was unconscious of the consequences of what he was saying." We find that the evidence in the record does not support appellant's contention that he was incapable of comprehending the consequences of his statements. The testimony of the police officers present when Shapiro gave his statements fully supports the State's position that the statements were voluntarily and knowingly given. The trial judge did not consider that the testimony of Dr. Joe Hayes, an expert in the field of forensic psychiatry, who had not seen Shapiro on the dates in question, outweighed the evidence presented by the State. In his reasons for denying the motion to suppress, the lower court stated:
"Officer Humphries testified that the defendant did not appear to be intoxicated or drugged at the time the statement was taken; Officer Callahan testified that the defendant appeared to understand what was taking place at the time the statement was given, but that the defendant was upset. Chief Ezernack, who had known the defendant a long time testified that the defendant knew what he was doing when he gave the statement. In the statement defendant told the officers that he was familiar with his Miranda rights.... No doctor who saw defendant on November 24th was called to testify."
We do not find from the evidence adduced that defendant was so drugged (or intoxicated) or in such an emotional state that he was unaware of what he was saying, or that his statements were involuntary. We reiterate the standard by which we determine the free and voluntary nature of a defendant's inculpatory statement challenged on the ground that the defendant was drugged or intoxicated at the time: the "confession (inculpatory statement) will be rendered inadmissible only when the intoxication is of such a degree as to negate defendant's comprehension and to render him unconscious of the consequences of what he is saying. Whether intoxication exists and is of a degree sufficient to vitiate the voluntariness of the confession are questions of fact. The admissibility of a confession is in the first instance a question for the trial judge. His conclusions on the *374 credibility and weight of the testimony relating to the voluntariness of a confession will not be overturned unless they are not supported by the evidence." State v. Godeaux, 378 So.2d 941 (La.1979); State v. Rankin, 357 So.2d 803 (La.1978).
Under the circumstances of the instant case, we do not find that the trial court erred in finding that the defendant's inculpatory statements were free and voluntary. The defendant's drugged condition (intoxication), or emotional state, if it did exist, was not of such a degree as to negate his comprehension and consciousness of the consequences of what he was saying. See State v. Fisher, 380 So.2d 1340 (La.1980).
This assignment lacks merit.

ASSIGNMENTS OF ERROR NOS. 3 AND 4
These assignments arise from a certain statement made by a prospective juror during voir dire examination, and the judge's admonition following the statement. The defendant complains of the trial judge's denial of his motion for a mistrial. The drastic remedy of mistrial is authorized only if the court is satisfied that an admonition is insufficient to assure the defendant a fair trial. See LSA-C.Cr.P. art. 771, State v. Madison, 345 So.2d 485 (La.1977). Hence, when a remark made by a prospective juror is of such a nature that it might create prejudice against the accused in the minds of the other jurors, the court shall admonish the jury to disregard the remark. State v. Madison, supra.
In the present case, the prospective juror was being questioned as to whether she had formed an opinion in view of news coverage of the incident in question. She indicated that she had not formed an opinion, as follows: "Well, I wouldn't say for this particular part of it, no. The first part of it I don't agree with some of the things that Mr. Shapiro did, so ... but I don't know if that ... (Interrupted)." The trial judge then admonished the jury panel to disregard the remarks of the prospective juror. In refusing the mistrial, the trial judge stated:
"... She made the comment; she did not say any crime or anything else. We didn't get to that point. She didn't approve of certain prior conduct at which point Mr. Small approached the bench and moved for a mistrial which I denied and informed him I was going to instruct the jurors that anything to do with any other activity, was my word, was not to be considered. After counsel returned to the table, I so instructed (the prospective juror) and all of the audience that no activity of the defendant, which wasn't alluding to any crime at all, could allude to some personal acquaintance, some personality problem or some conduct, criminal or non-criminal, that she might be thinking about. I don't know and I don't think the prospective panel does either, had nothing to do with this law suit and I then read the charge and told her that this is all that we are allowed to consider and only what happens in the courtroom and the law as I give it to her. She said she would do that. I don't think the court commented on any other offenses, nor did the witness, and, therefore, the Motion for a Mistrial is denied."
We find that the motion of mistrial was properly denied, and that admonition as given by the trial judge was proper under the circumstances of this case. See State v. Monroe, 397 So.2d 1258 (La.1981). As a further complaint to this occurrence, the defendant urges that the judge's admonition was an indirect reference to or comment upon another offense. The judge was careful in his choice of words, referring to other "activities"; and, in the context in which his admonition was given, his remarks cannot be construed as a prejudicial remark interdicted by LSA-C.Cr.P. art. 770. See State v. Gallow, 338 So.2d 920 (La. 1976).
These assignments are without merit.

ASSIGNMENT OF ERROR NO. 5
Defendant argues in this assignment of error that the trial court erred in admitting defendant's statements in evidence "in the *375 absence of predicate (or subsequent) proof by the state of corpus delicti."
In the present case we consider that the corpus delicti of the crime charged, i.e., second degree murder, was proved, and that this proof was established by evidence independent of the defendant's inculpatory statements. See State v. Carson, 336 So.2d 844 (La.1976). It is not necessary that evidence independent of a confession (inculpatory statement) encompass all of the elements of the crime charged in proving the corpus delicti. A confession or inculpatory statement may be used to supplement the proof of the corpus delicti provided independent proof corroborates the confession (inculpatory statement), thus indicating its trustworthiness. See Smith v. United States, 348 U.S. 147, 75 S.Ct. 194, 99 L.Ed. 192 (1954); State v. Ashley, 354 So.2d 528, 530 (La.1978) (Dixon, J., concurring).
The record reflects that the State proved that the victim was found lying on her back, bleeding from a gunshot wound to the face, with the weapon belonging to Shapiro near her body in Shapiro's residence. The State also proved a prior altercation between the victim and the defendant. The evidence definitely placed the defendant at the scene. Atomic absorption tests revealed the presence of gunshot residue on the defendant's hands, but none on the victim's. The autopsy showed that the gun had not been held against the skin of the victim when fired. The autopsy established that the cause of death was a massive cerebral laceration due to a single gunshot wound of the right cheek.
The proof of the corpus delicti must be made independent of the accused's inculpatory statement or confession (an uncorroborated confession will not of itself sustain a conviction); however, proof of the corpus delicti is not required as a prior condition for admission into evidence of an inculpatory statement (or confession), so long as proof of the corpus delicti is subsequently established during trial. State v. Romero, 369 So.2d 1342 (La.1979). In the case at bar the State did establish the corpus delicti during the trial.
It is our opinion that the State proved the corpus delicti of the crime charged to the defendant, i.e., that Lavonna Ryland was the subject of an unlawful homicide and the unlawfulness of some person's conduct caused her death. This proof was established by evidence independent of defendant's inculpatory statements. While proof that the defendant was the person who engaged in this unlawful conduct is essential to a conviction, it is not an element of the corpus delicti. State v. Freetime, 334 So.2d 207 (La.1976).
We do not, therefore, find any merit in this assignment of error.

ASSIGNMENT OF ERROR NO. 6
By this assignment, defense argues that the trial court erred in admitting into evidence, over objection, numerous allegedly gruesome and prejudicial photographs. The photographs presented were seven black and white and one color, and appear to depict the scene and the victim's body at the scene.
The test of admissibility for allegedly gruesome pictures is whether their probative value outweighs the possible prejudice that may result from their display to the jury. State v. Manieri, 378 So.2d 931 (La. 1979); State v. Lewis, 353 So.2d 703 (La. 1977). Photographs of the body of the victim have generally been held relevant to prove the corpus delicti, to corroborate other evidence of the manner in which death occurred, to establish location, number and severity of the wounds, and to establish the identity of the victim. State v. Landry, 388 So.2d 699 (La.1980); State v. Cooper, 334 So.2d 211 (La.1976).
After examining the photographs in question, we are of the opinion that they are not especially gruesome. Moreover, they were probative to the material issues of the identity of the victim, the corpus delicti, and the cause of death. The main issue in this trial was whether the death of the victim resulted from suicide, accident, or homicide. The position of the body, the location of the wound, and location of items *376 in the room in relation to the body (as shown in the photographs) had distinct probative value outweighing any gruesomeness or probable inflammatory effect. Defendant further argues that since similar black and white photographs had already been introduced, the offering of the color photograph was repititious and had no probative value over and above the black and white photographs. The previous admission of similar photographs is only a factor to be considered in balancing the probative value and prejudicial effect of the photographs that defendant views as objectionable. That balancing decision is for the trial judge. A trial court's ruling in regard to the admission of this evidence will be disturbed only if it can be shown the prejudicial effect in fact clearly outweighs the probative value. State v. Brown, 395 So.2d 1301 (La.1981). Under the circumstances of this case, the trial judge's decision to admit the photographs cannot be said to have been error.
The assignment lacks merit.

ASSIGNMENT OF ERROR NO. 7
The appellant argues on this assignment of error that the trial court erred in failing to sustain the defense's objection to a hypothetical question posed by the State to one of its expert witnesses, Dr. George McCormick, because the question was, in part, not grounded upon facts previously introduced into evidence. Defense complains that the question assumes that the body of the victim had not been moved while previous testimony by a paramedic with the ambulance service who had administered medical attention to the victim established that the body had been moved. The appellant refers to the testimony of the paramedic as follows:
"Q. Okay. Do you know whether or not you ever ... were you working on the young lady at the time they commenced taking pictures?
A. Yes, I was.
Q. You had already commenced your functions?
A. Right.
Q. Okay. My understanding is that one thing you had to do was, I believe, tilt her head to get a(n) air passage?
A. Right.
Q. Is that correct?
A. Yes, sir.
Q. What is meant by that?
A. Well, you move the head in certain ways and lift the jaw up a certain amount to get the tongue off the back of the throat to ...
Q. Okay.
A.... to assure a good airway.
Q. Now, you think that was done before pictures were taken?
A. I believe it was, yes, sir."
The quoted testimony does not support appellant's contention. The paramedic's testimony merely indicates some tilting movement of the head in an attempt to provide an air passage. All of the evidence in the record establishes that the victim's body had not been moved prior to the photographs being taken. The photograph upon which the expert based his answer to the hypothetical question shows the position of the body after it had fallen from the shot. The question was not based upon an assumption of facts which had not been proved. The question was not violative of LSA-R.S. 15:278, and was permissible. The objection was properly overruled.
This assignment is without merit.

ASSIGNMENT OF ERROR NO. 8
By this assignment, defense counsel argues that the trial court erred in failing to grant defendant's motion for a mistrial based on the State's failure to disclose the results of scientific tests and experiments, after defendant's pretrial discovery motion requesting such results.
There is no merit to this argument. The record shows that the State did not have in its possession any report of scientific tests or experiments. The testimony of Dr. George McCormick, a forensic pathologist *377 and coroner, concerning his opinion as to whether there was anything unusual about the smearing of blood on the back of the victim's pants does not constitute a "scientific test or experiment."
The record reflects that no tests or experiments were conducted on the jeans in question. The pathologist merely gave his opinion as to what caused the bloodstains based upon his visual examination of the pants. LSA-C.Cr.P. arts. 719 and 723 do not require the disclosure demanded by the defendant. In addition, the pants were readily available to the defense for any examination or tests he cared to have made upon them. We find that the State did not fail to comply with the disclosure requirements of the discovery provisions, or that the defendant's rights have been in any way prejudiced by the State's handling of the pathologist or his testimony concerning his visual examination of the pants of the victim.
Under the circumstances herein recited, no substantial right of the accused, that is, the right to prepare an adequate defense, was adversely affected. Hence, we find that the trial judge did not abuse his discretion in refusing to grant a mistrial.
This assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 9
Defendant complains in this assignment of the trial court's refusal to give a requested special jury instruction to the effect that unanimity of the twelve jurors was required in order for the jury to return a verdict. The record reveals that the defendant was convicted by a vote of eleven to one. By this assignment of error the defendant urges the unconstitutionality of the non-unanimous verdict. Basically, his argument is that a non-unanimous verdict system dilutes the standard of proof of guilt beyond a reasonable doubt.
There is no merit to this assignment. The less than unanimous verdict has been upheld by the United States Supreme Court and by this Court. Johnson v. Louisiana, 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972); State v. McIntyre, 381 So.2d 408 (La.1980). The vote of one juror for acquittal can in no way be said to impeach the verdict of the other eleven jurors, or to demonstrate that guilt was not in fact proved beyond a reasonable doubt.
This assignment of error lacks merit.

ASSIGNMENT OF ERROR NO. 10
Defendant contends that the trial court erred in denying his motion for new trial based on the insufficiency of the evidence to sustain the verdict and that the circumstantial evidence relied on by the State failed to exclude every reasonable hypothesis of innocence.
In order to find sufficient evidence to support a verdict of conviction, it must be concluded that after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found that the defendant was guilty beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Hartman, 388 So.2d 688 (La.1980). The State, for conviction, must prove beyond a reasonable doubt every essential element necessary to constitute the crime charged. In Re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); State v. Harveston, 389 So.2d 63 (La.1980).
There is ample evidence in the record viewed in the light most favorable to the prosecution to establish that Lavonna Ryland died from a gunshot wound to the brain; the gunshot was fired from a gun (a .38 revolver) which Shapiro had purchased; Shapiro went out to his car and got bullets for the gun; there had been an altercation between the victim and the defendant earlier in the night at the hospital; the victim and the defendant were the only persons on the premises; there was gunshot residue on the defendant's hands but no such residue on the victim's; in his statements the defendant denied touching the body at all; and also denied touching the gun after the shot was fired; the defendant admitted that Ryland was not depressed and did not say anything to him at the hospital about taking her own life; he admitted *378 that the gun did not have a hairtrigger or a tendency to go off accidentally; the defendant admitted that when he arrived home from the hospital, he ordered Ryland to "get out of the house"; the deceased was packing to leave defendant's residence; and the reconstruction of the crime scene by the State's experts discounts Shapiro's version of the incidents at his residence. We find no evidence that cannot be reconciled with defendant's guilt. There was no indication of suicide: the deceased was not depressed; there was no gunshot residue on the victim's hands; the wound was a facial not a temple wound; the wound was not a contact wound; the evidence discounts that the incident happened the way Shapiro reported it as happening in his statements; the deceased left no suicide note; and there was no evidence of prior threats of suicide other than the self-serving declarations of the defendant. There was no evidence of an accidental shooting: the defendant gave two different versions of the incident; the scene reconstruction discounts accidental shooting; the gun was not a hair-trigger pistol and had no defective mechanism; there was no gunshot residue on the victim's hands; and the position of the body and the nature or design of the bloodstains discount an accidental shooting.
In concluding that the defendant specifically intended to kill the deceased (LSA-R.S. 14:30.1), the jury was apparently unpersuaded by the defendant's own self-serving statements that the deceased accidentally shot herself or committed suicide.
LSA-R.S. 14:30.1 provides that specific intent to kill or inflict great bodily harm is necessary for a second degree murder conviction. However, specific intent is a state of mind, and need not be proved as a fact; it may be inferred from the circumstances of the transaction and the actions of the defendant. LSA-R.S. 14:10(1); LSA-R.S. 15:445; State v. Boyer, 406 So.2d 143 (La. 1981); State v. Williams, 383 So.2d 369 (La. 1980).
We hold that the verdict of guilty of second degree murder is clearly supported by the evidence in this case. A rational trier of fact could certainly have found from this evidence that the defendant had a specific intent to kill or inflict great bodily harm, and that the State has proved these essential elements of the crime of second degree murder beyond a reasonable doubt.
Further, defendant contends that the trial court erred in not overturning the verdict when the verdict was based only on circumstantial evidence, and that the evidence did not exclude every reasonable hypothesis of innocence. Defendant relies on LSA-R.S. 15:438, as follows:
"The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence."
Circumstantial evidence is defined as evidence of facts or circumstances from which one might infer or conclude the existence of other connected facts. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Austin, 399 So.2d 158 (La.1981).
We believe that the State was not relying solely on circumstantial evidence to establish the guilt of the defendant, inasmuch as the State presented Shapiro's conflicting taped statements. Nevertheless, we find that the record contains circumstantial evidence of the defendant's guilt sufficient to exclude every reasonable hypothesis of innocence. The contested factual issues included the cause of death, and whether Ryland was the victim of a gunshot wound intentionally inflicted by Shapiro, or of suicide, or accidental death.
Faced with the facts and circumstances in evidence from which to draw an inference according to reason and common experience, the jury concluded that the recited facts and circumstances did not offer a reasonable hypothesis of innocence of Shapiro. After reviewing the evidence presented at trial, in the light most favorable to the prosecution, we conclude that a rational trier of fact could have concluded beyond a reasonable doubt that every reasonable hypothesis *379 of innocence had been excluded. Jackson v. Virginia, supra; State v. Edwards, 400 So.2d 1370 (La.1981).
This assignment of error is without merit.

DECREE
For the reasons assigned, the conviction and sentence of Alfred B. Shapiro are affirmed.
AFFIRMED.
LEMMON, J., dissents.
FELIX N. SAVOIE, Jr., J. ad hoc, dissents and will assign reasons.

On Rehearing
CALOGERO, Justice.
On our original hearing on this appeal, a majority of this Court, composed of four associate justices and three justices ad hoc, affirmed this defendant's conviction and sentence for the second degree murder of one Lavonna D. Ryland. The full Court granted this rehearing[1] to re-examine the serious contention that the evidence was insufficient to support the conviction. After thoroughly reviewing the evidence anew, we find it insufficient and reverse the conviction accordingly.
An overview of the incident and the defendant's version of the events were set forth in the original opinion. Since this case involves circumstantial evidence and a defense challenge to the sufficiency of that evidence under La.R.S. 15:438 and Jackson v. Virginia, 443 U.S. 307, 309, 99 S.Ct. 2781, 2783, 61 L.Ed.2d 560 (1979), we will recite that evidence in some detail.
Lavonna Ryland for several months had been living with Alfred Shapiro in his house in Alexandria, Louisiana. During breakfast on Saturday morning, November 24, 1979, Shapiro's legs collapsed on him from possible amphetamine abuse and Ms. Ryland drove him in his car to St. Francis Cabrini Hospital. A number of people visited Shapiro and Ryland that day. Cynthia Cunningham met them at the hospital and persuaded Ryland to come to her place to clean up, after which Ryland returned to the hospital. At about 3:00 p.m. Ryland called Cunningham to report that she had been in an automobile accident while driving the defendant's car. The two then went to a restaurant called Pepper's after dropping off Shapiro's car. After a few hours Cunningham took Ryland back to Shapiro's house and they parted company. Ryland again returned to the hospital. Later that evening Cunningham received a telephone call from Ryland who was in Shapiro's hospital room and was upset about not having been invited to a party. She said she had decided to stay at the hospital with Shapiro. That evening Shapiro claims that Ryland and he had an in depth discussion about their relationship. He felt that Ryland was insecure about him and afraid of his possibly having an affair with Cindy Cunningham.
At approximately 1:30 a.m. on November 25, 1979, in Shapiro's hospital room, an altercation between Shapiro and Ryland took place. Shapiro claims that Ryland became upset during an argument, grabbed a bottle of valium from his drawer and tried to swallow a handful. He grabbed her, forced her mouth open and pulled most of the pills out. The disturbance drew nurses and security guards to the room. Ryland was heard to say from inside the room "Please don't hit me again" and "You don't love me like you said you did. You promised to leave your family for me but you didn't." When the door was opened, Ryland was upset and crying; the room was in disarray and valiums were strewn about the floor. There was a blue discoloration around Ryland's mouth, consistent with the color of the valium pills. Ryland left shortly thereafter. As she ran down the hall to the elevator, she refused offers of help and told everyone not to bother her. She was seen walking home in the rain. Shapiro immediately *380 gathered up his belongings, approached the nurses' station and told them he had to leave to keep Ryland from hurting herself. All of the hospital personnel agreed that Shapiro did not exhibit any hostility and seemed concerned for Ryland's well being. Shapiro received permission from his doctor to be discharged. At approximately 2:15 a.m., a hospital security guard helped Shapiro find his car and watched him leave. Shapiro told him "I better go find her or she'll kill herself."[2]
Ryland returned to Shapiro's house at approximately 2:30 a.m. Ryland's sister and brother-in-law, Leska and Terry Dauzat, their baby, and another child were staying that night at Shapiro's house with his permission, because their own television was out of order. Ryland appeared visibly upset when she arrived at the house and telephoned the hospital to ask the nurse if she could return. The nurse begged her not to come back and reported that Shapiro had left. Shortly thereafter Shapiro came up the driveway to the residence. Ryland refused to let him inside saying "Where's my gun? I'll kill him." Leska Dauzat let the defendant inside, explaining to her sister that they had to let Shapiro into his own house. Shapiro entered with a suitcase or overnight bag and went straight to the back bedrooms without speaking. Ryland followed him. Leska and Terry Dauzat said the defendant's face and manner did not exhibit any consternation. Both Shapiro and Ryland went outside and then came back in, with Ryland carrying a sweater. They walked past the Dauzat's toward the back bedrooms. Shortly thereafter Ryland came out to the den and said that Shapiro wanted them to leave. The Dauzat's and the two children got their things together and left. Upon arriving home, Leska tried to call the Shapiro house but kept getting a busy signal. On the fourth try in about fifteen minutes, she succeeded, only to be met with the news from someone other than Shapiro that her sister, Lavonna, had been shot and was on her way to the hospital.
In two sworn statements[3] the defendant gave the following version of what happened. He recalled going back out to his car a couple of times after arriving home. The first time he noticed six .38 caliber bullets on the floorboard of his car behind the driver's seat.[4] He brought the bullets inside, probably placed them on the bedroom dresser and began unpacking. Ryland had been packing her clothes to leave. Shapiro went back outside to move his car into the carport after the Dauzat's had left because it was raining and his windshield had a leak. He claims that he thought Ryland had left with her sister and brother-in-law. When he opened the door to go inside his house from the carport, he saw Ryland some six feet straight ahead of him, more or less facing him, two to three feet into the bedroom holding a pistol to her head with the hammer cocked. At first he expressed the belief that the gun was pressed against her temple, but later he stated that she may have been bringing the gun down from the temple when it fired. He first claimed too that she seemed to have shot herself intentionally, but later said that the gun may have gone off accidentally. Regardless, he remembers his screaming and running around the house after Ryland shot herself. He tried dialing 911 and then telephoned the Sheriff's office to report the suicide. In his sworn statements he said he kept coming back to look at her and probably knelt down but did not touch her or the revolver. However, on March 12, 1980, he told Officer *381 Humphries in an unrecorded interview that it was possible that he could have touched the victim or the weapon.
When the police responded to the call, they found the defendant hysterical, saying "She shot herself." In the bedroom the victim lay on her back perpendicularly to and with her head nearest the doorsill. Her body and legs extended into the middle of the room. She was bleeding extensively from her head wound, but still breathing. The butt of a .38 revolver was protruding from under her left knee. No suicide note was found. Officer Carmouche testified: "[He] [Shapiro] said Ms. Ryland had gotten the gun and had loaded it with the bullets in the back seat and he was in the bedroom where we had found her at and she walked in and shot herself."
Sergeant Urena, the investigating officer, arrived after about a twenty minute delay, at which time the emergency technicians had already left to take Ryland to the hospital, and Shapiro had changed from his robe and pajamas to blue jeans and an army field jacket. Urena took custody of the gun from Officer Carmouche. The weapon, a .38 caliber revolver purchased by Shapiro and given to Ryland, had five live rounds and one spent cartridge. No fingerprints were lifted from the weapon, nor was it preserved for possible fingerprinting. However, there was gunshot residue on the weapon.
At the scene Urena conducted the preliminary procedures of the atomic absorption test to determine whether the defendant might have fired or handled the weapon. Sergeant Urena swabbed the defendant's hands with Q-Tip swabs from a "Sirchie Kit". The Sirchie Kit also contains six vials of 5% Nitric Acid solution. The Q-Tips were used to swab the backside and palm of each of Shapiro's hands and the cartridge casing of the gun. One Q-Tip was used as a control swab. After swabbing the defendant's hands Sergeant Urena proceeded to the hospital to swab the victim's hands in like manner. At the hospital Urena was required to wait approximately fifteen minutes before he could swab the backs and palms of the victim's hands in the emergency room.
Much of the testimony was devoted to whether the victim's hands were washed prior to the atomic absorption testing. Paramedic James Brasher testified that he inserted an IV in the victim's right arm but did not wash her hand. Paramedic Sylvester Eldridge testified that he helped transport the victim from the ambulance to the hospital, helped her breathe with an "ambu bag" and somehow got blood on his jacket from the victim's right arm. Eldridge also helped clean up the victim before the victim's family saw her. Nurse Catherine Holt was in charge of the emergency room when the victim was brought in and first testified that she did not recall anyone cleaning the victim's hands. Later she testified that she thought she saw Harvey Mitchell wash the victim's right hand. Mr. Mitchell, however testified that he did not wash the victim's hands, nor did he see the victim's hands being washed.
Doctor McCormick a forensic pathologist and coroner from Bossier Parish, Louisiana, exhumed the victim's body and conducted an autopsy. Ryland's stomach and digestive tract were free of pills, capsules or other identifiable medication, traces of which probably would have been found if the victim had ingested pills during the argument she had had with the defendant at the hospital. Furthermore, his examination of the body indicated that the gun had been held two to six inches away from her head when it was fired. By means of a diagram, Dr. McCormick illustrated for the jury the path the bullet had taken. It had entered her head three inches below her right eye and travelled upward and to the left, exiting above and behind the left ear. Because of the attention given at trial to the presence or absence of barium and antimony on their respective right hands even though both right and left hands were swabbed, apparently the victim, as well as the defendant, was right-handed. Dr. McCormick was of the opinion that the position of the victim's body was not compatible with her having been standing two to three *382 feet inside the doorway and facing out of that doorway in the direction of the hallway at the time she was shot. Had she been facing out of the bedroom, she would probably have fallen backwards from the forceful impact and recoil of the gun, landing with her feet near the doorsill and with her head farther inside the room. The photographs taken at the scene shortly after the first policemen arrived showed the reverse to have been true. Her head was near the doorsill and her body and legs were extended into the room away from the hallway. Likewise it was unusual, according to Dr. McCormick, that the gun would have been under the victim's left leg because of the manner in which the gun would likely have recoiled upon firing. He also suggested a blood smear on the pants of the victim indicated that the body may have been dragged or moved after resting on or against blood.
William Kinard of the Bureau of Alcohol, Tobacco and Firearms, United States Treasury Department in Washington, D.C. testified as an expert in forensic chemistry that atomic absorption tests are designed to detect the presence of antimony and barium, two elements which are normally dispersed from the muzzle and cylinder of a firearm when it is discharged. According to Kinard, if prescribed significant levels of both these two elements are found on the back of the hand then that finding is consistent with the person's having recently fired a weapon. If significant levels of these two elements are found only on the palm of the hand, however, then it is only consistent with the handling of a recently discharged firearm. Kinard testified that he found significant amounts of barium and antimony only on the palm of defendant's right hand, a result consistent with only the handling of the weapon and not the firing. The victim's hands did not contain the requisite levels of antimony and barium to establish that she had likely fired a weapon or handled one after firing.
On cross-examination Mr. Kinard admitted that had the defendant pushed the gun after it had been fired, or touched the victim's face or hair, then he could have gotten enough antimony and barium on his right palm to coincide with the positive levels which were found on his right palm. On redirect, Kinard addressed the potential for transposition of barium and antimony from one area of the hand to another upon changing clothes and/or the wringing of hands.
A great deal of the defense testimony was that of Dr. Charles Petty, a Dallas, Texas forensic pathologist who was qualified as an expert. Prior to testifying, he had reviewed the photographs of Ryland and of the crime scene, and the autopsy report of Dr. McCormick. In that report, Dr. McCormick had expressed the opinion based on certain physical facts that suicide was improbable. Dr. Petty disputed the conclusions of improbability contained in Dr. McCormick's report. Dr. Petty was of the opinion that there was not enough information "to be certain one way or another as to whether this was a suicide or some other manner of death."
Dr. Petty gave some testimony about his knowledge of three different suicidal types. Some are suicidally-bent persons who have problems that seem insurmountable, who think about it for a while, but are ambivalent, before actually deciding to take their lives. Others are career suicidals who arrange their whole lifestyle around the idea that eventually they will commit suicide. These persons spend much time deciding how to do it, how to conduct themselves, how to make arrangements. Then perhaps ten or fifteen percent of all suicides are committed by the impulsive suicidal types. In this latter case, everything seems to be going reasonably well but, because of a sudden situation or immediate provocation, they decide on suicide, perhaps to make an impression on someone. They react rapidly to the thought of suicide and use what is then at hand.
Dr. Petty was asked particularly what weight he would give to the body position as shown in the photographs of the scene. Although a layman might assume that a body would fall backwards when shot in *383 this manner, Dr. Petty testified, it is impossible to predict with any accuracy how an individual will fall or, for that matter, what an individual will do after being shot. There is no reason to believe that the collapse will be instantaneous, or that the shot will cause the individual to fall directly. One leg may collapse before the other, or one arm before the other. There is no way medically to predict that, Petty continued. Furthermore, he said the striped blood stains on the victim's blue jeans could be consistent with a number of possibilities including moving the victim from the floor to the stretcher or the crumpling of the blue jeans in a ball after they were removed in the hospital.
On cross examination, Dr. Petty conceded that while he could not rule out suicide, he similarly could not rule out homicide. On redirect, defense counsel questioned Dr. Petty's earlier statement that firearm residue was important mostly from a confirmatory standpoint. He elicited the following response:
It means that if I pull this weapon as was suggested by the other gentleman [Dr. McCormick] in the so-called traditional arrangement, there is no reason to believe necessarily that I will have the firearm's residue on my hands if I discharge the weapon.
Q. And why is that?
A. I don't precisely know why it is.
Q. But do studies not substantiate what you've just said?
A. Studies will show ... certainly the studies that I'm familiar with show that firearms residue are not uniformly present on the hands of individuals who discharge different weapons and as a matter of fact, in studies of some groups of suicidally inflicted wounds, the hand washings [swabbings] in people whose hands have been properly protected from the time that the body has been discovered and the hands then washed [swabbed], as many as twenty or twenty-five percent of them fail to show any residues whatsoever.
Therefore, Dr. Petty found the results of the residue tests on Ryland's hands to be inconclusive: "They did not prove that she discharged the firearm and on the other hand they did not prove that she did not discharge the firearm."
Finally, the defense and the state stipulated that Jim Churchman, a forensic scientist, would testify that when Shapiro's two robes were tested on July 28, 1980 (eight months after the incident and after both robes had apparently been washed), no firearm residue was found.
Essentially this is all the evidence there was. The question then is whether this evidence presented at trial was sufficient to sustain the defendant's conviction for the second degree murder of Lavonna D. Ryland.
We had occasion recently to consider the standards by which the sufficiency of the evidence is to be judged in this state in the second degree murder case of State v. Lenon Williams 423 So.2d 1048 (La.1982). The Chief Justice, as the organ of the Court, succinctly reviewed the constitutional and statutory standards involved in the review of an insufficiency of evidence assignment of error. Supra at 1051-52. He wrote:
"In Jackson v. Virginia, 443 U.S. 307 [99 S.Ct. 2781, 61 L.Ed.2d 560] (1979), the United States Supreme Court held that the Fourteenth Amendment's due process guarantee required that a state criminal conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime charged beyond a reasonable doubt. Reasonable doubt may be overcome by circumstantial evidence, thus fulfilling the requirements of due process. However, federal due process standards do not require that circumstantial evidence exclude every hypothesis other than guilt. Jackson v. Virginia, supra[5]Holland v. United States, 348 U.S. 121 [75 S.Ct. 127, 99 L.Ed. 150] (1954).

*384 "Circumstantial evidence in Louisiana criminal convictions is held to a higher standard. R.S. 15:438 provides:
"`The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.'
"The Louisiana legislature has, through this statute, provided greater protection against erroneous convictions based on circumstantial evidence than is provided by the Fourteenth Amendment. There is a possibility that the quality of evidence supporting a conviction would satisfy Jackson v. Virginia, supra, but would not satisfy the requirement of R.S. 15:438."
Where there is direct evidence (as for instance, a witness, or several, to the crime itself), the trier of fact weighs the credibility of that evidence and the reviewer under Jackson defers to that trier of fact, assuming the proven facts most favorable to the state.
In all cases where an essential element of the crime is not proven by direct evidence, La.R.S. 15:438 applies. As an evidentiary rule, it restrains the factfinder in the first instance, as well as the reviewer on appeal, to accept as proven all that the evidence tends to prove and then to convict only if every reasonable hypothesis of innocence is excluded. Whether circumstantial evidence excludes every reasonable hypothesis of innocence presents a question of law. State v. Hammontree, 363 So.2d 1364 at 1373 (La.1978); State v. Schwander, 345 So.2d 1173 at 1175 (La.1977); State v. Smith, 339 So.2d 829 at 833 (La.1976). In applying La.R.S. 15:438, all the facts that the evidence variously tends to prove on both sides are to be considered, disregarding any choice by the factfinder favorable to the prosecution. The reviewer as a matter of law can affirm the conviction only if the reasonable hypothesis is one favorable to the state and there is no extant reasonable hypothesis of innocence.
While, at an earlier time in State v. Austin, 399 So.2d 158 (La.1981), we expressed the Jackson constitutional standard and the circumstantial evidence rule of La.R.S. 15:438 in tandem,[6] we more recently qualified that expression in State v. Graham, 422 So.2d 123 at 129 (La.1982), as follows:
[A] merger does not appear to promote clarity but could lead to a distortion of the standards. A combination of the rules may incorrectly imply that, when all of the evidence of the defendant's guilt is circumstantial, due process requires more than evidence which would satisfy any rational juror of proof of guilt beyond a reasonable doubt. On the other hand, an in-tandem articulation may seem improperly to diminish the requirement of the *385 circumstantial evidence rule by implying that, in a close case, this court will defer to the jury's finding rather than follow its own determination of whether there is a reasonable hypothesis of innocence. Although in many instances separate and dual applications of the rules will yield the same result, out of an abundance of caution we will proceed to apply each standard separately, as it was given to us by the framers. (Emphasis provided.)[[7]]
In this case there is no direct evidence of an essential element of the crime charged. There is no direct proof that the defendant fired the weapon or that he did so with an intent to kill. The only undisputed fact that tends or may tend to prove that he fired the weapon, setting aside problems of inconclusive gunpowder residue tests, inconsistent conclusions by forensic experts, and inconsistent statements by the defendant, all of which will be discussed hereinafter, was that the victim was shot at a time when the house was occupied only by the defendant and the victim.[8] We have here then a purely circumstantial evidence case. To uphold the conviction under Jackson's federal due process standards, we must find that any rational trier of fact, viewing the evidence in a light most favorable to the prosecution could have found the necessary elements of the crime charged beyond a reasonable doubt. Beyond that, we must find under Louisiana's statutory test that the circumstantial evidence presented at trial, "assuming every fact to be proved that the evidence tends to prove," excludes every reasonable hypothesis of innocence. La.R.S. 15:438.
The test of the sufficiency of circumstantial evidence is not whether it produces the same conviction as the positive testimony of an eyewitness, but whether it produces moral conviction such as would exclude every reasonable doubt. State v. Jenkins, 134 La. 185, 63 So. 869 (1914). "It must not only be sufficient to convict the defendant, but, in testing its sufficiency, it must exclude the [reasonable] hypothesis that somebody else [in this case, the victim] committed the offense." Jenkins, supra quoting Murphy v. State, 36 Tex.Cr.R. 24, 35 S.W. 174 (1896). State v. Vinson, 37 La.Ann. 792 (1885) had earlier enunciated "the rule recognized by the authorities, that where a criminal charge is to be proved by circumstantial evidence, the proof ought to be not only consistent with the prisoner's guilt but inconsistent with any reasonable hypothesis. See State v. Swayze, 30 La. Ann. 1323, 1327 [1868]; State v. Willingham, 33 La.Ann. 537 [1881] and authorities there referred to." We applied this rule most recently in Graham, supra.
The defense suggests that the hypotheses that the deceased committed suicide or was the victim of a self-inflicted accidental shooting are reasonable and are supported by the evidence. The deceased had attempted to commit or threatened suicide earlier that evening, when she attempted to ingest a large quantity of valium, and she had tried to commit suicide before, according to defendant's statement. The defendant voiced concern upon leaving the hospital that the deceased might hurt herself if he did not stop her. The weapon was discharged at an angle and from a distance not *386 inconsistent with suicide. The deceased was upset and was looking for a gun moments before her injury, admittedly with comments more in keeping with an assaultive rather than suicidal disposition.
The state, on the other hand, contends that the weapon was discharged by the hand of the defendant. The fact that the revolver was not defective or modified in any manner, and the fact that the weapon was fired into the victim's face from a distance of two to six inches, the state argues, can reasonably indicate that the person firing the weapon intended to kill or seriously injure. Furthermore, evidence from witnesses who saw the defendant immediately before and after the shooting indicates that Shapiro's ability to form the requisite criminal intent had not been diminished by either alcohol or drugs.
The fact at issue that the state had to prove was that the defendant Alfred Shapiro shot Ryland "with the specific intent to kill (her) or to inflict great bodily harm." La.R.S. 14:30.1(1). To so prove under the statutory requirements of a circumstantial evidence case, therefore, the state had to exclude the defense's suggested hypothesis of an intentional suicide or an accidental firing by the victim while threatening suicide. To that end, the state presented at trial hospital and police personnel, a personal friend of the couple, two of Ryland's relatives, expert forensic testimony and the two taped statements of Shapiro. In support of the hypothesis of suicide, the defense presented hospital and police personnel and expert forensic testimony. The main fact at issue on both sides was the central question of who fired the gun.
The forensic evidence did not exclude either Shapiro's or Ryland's firing the gun. As indicated earlier on, each had the residue testing done within several hours of the shooting. It is a particular significant concentration of both barium and antimony on the back of the hand which confirms an individual's having fired the weapon. Neither defendant nor Ryland had such concentrations. The results were therefore inconclusive. Shapiro's results showed above normal concentrations of barium and antimony on the palm of his right hand, and clean swabbings otherwise. Ryland's barium and antimony levels were all normal, and her swabbings showed background traces which would be present in instances of simply unwashed hands.[9] The results were therefore inconclusive on the question of who fired the weapon. Either Shapiro or Ryland could have fired the .38 revolver and whichever one of them did so could either have had the residue removed or have escaped the deposit of concentrated barium and antimony residue on the rear of the hand.
The state contended that the only reason there was no concentration of barium and antimony on the back of Shapiro's right hand was that it was probably transferred to his right palm when he wrung his hands nervously at the scene, and/or when he changed from the pajamas and robe he was wearing when the police first arrived into the army field jacket and blue jeans he was wearing when the test was administered. As for the deceased, the defense relies upon the fact that there clearly was a flurry of activity around her as she was attended by medical personnel at the scene and at the hospital. Ryland's body was moved both at the scene for emergency technicians to administer aid, and for transportation in an ambulance from Shapiro's house to the hospital. One of her attendants had blood on his jacket when he arrived home, indicative of close contact with her. Gunshot victims are cleaned up before their families see them.[10] And, of course, overriding all of this is the possibility, attested to by Dr. Petty, that a person firing a given weapon will sustain no residue evidence of barium and antimony from the gunpowder.
*387 Suicide is also not excluded by the expert testimony concerning the position of the gun at the time it was fired and the path of the bullet. As indicated earlier Ryland was right-handed. The gun was held two to six inches away from the victim's head; the bullet entrance wound was approximately three inches below her right eye; the bullet exit wound was just above and behind the left ear.
Regarding the body position, the location of the gun, and the consequences of these factors in determining whether the gunshot wound was self-inflicted or not in this case, even the state's expert spoke only of assumptions, probabilities, possibilities and suggestions.[11]
Probabilities or less, however, are not sufficient to convict, neither in direct evidence cases, nor in circumstantial evidence cases.
In State v. Gould, 395 So.2d 647 (La.1981) a case involving the sufficiency of evidence to support a finding of the existence of a dangerous weapon, supra at 656, and decided under the Jackson standard, this Court quoted with approval a jury charge from the earlier case of State v. Jefferson, 43 La.Ann. 995, 10 So. 199 (1891)
It is not sufficient you should believe his guilt only probable. In fact, no degree of probability merely will authorize a conviction; but the evidence must be of such a character and tendency as to produce a moral certainty of the prisoner's guilt to the exclusion of reasonable doubt.
The U.S. Fifth Circuit said in Ah Ming Cheng v. United States, 300 F.2d 202 at 203, 204 (5th Cir.1962), a case involving a charge of conspiracy to import opium unlawfully:
But it is equally well established that, where a case rests, as this one does, entirely upon circumstantial evidence, the circumstances must be so clearly proven that they point not merely to the possibility or probability of guilt, but to the moral certainty of guilt. In other words, the inferences which may reasonably be drawn from the facts proven as a whole must not only be consistent with guilt, but inconsistent with every reasonable hypothesis of innocence.
* * * * * *
"This proof may be circumstantial or direct, or both, but it must be proof. That is, the evidence must have a legitimate tendency to compel belief in and finding of defendant's guilt." [quoting Kassin v. United States, 87 F.2d 183 at 184 (5th Cir.1937)]
Dr. McCormick's testimony does not have a "legitimate tendency to compel belief in [nor to compel] a finding of defendant's guilt;" nor does his testimony "tend to prove" defendant's guilt, exclusively. Compare State v. Austin, supra at 159, a circumstantial evidence case, in which the expert in the area of shoe print and tire tread impression identification was 100% certain that the shoe print on the magazine was made by the defendant's shoe to the exclusion of all other shoes in existence in the world.
Finally, even accepting Dr. McCormick's opinion (which was countered by the testimony *388 of Dr. Petty) that Ryland was not standing where Shapiro indicated and that the gun did not fall and come to rest where it was when the pictures of the scene were taken, all such evidence tends to prove is that Shapiro's version of the events was not entirely accurate.
Perhaps the best part of the state's case was the fact that the jury had before them a number of defendant's statements from which they might have concluded that Shapiro was being less than candid rather than confused about the events of the evening. Although distraught to begin with, Shapiro was cooperative and did not hesitate to permit two taped conversations in addition to several untaped conversations with law enforcement officers about the incident. Among the several statements, however, there is some discrepancy. For instance, to Officer Carmouche at the scene he said that he was in the bedroom when Ryland came in and shot herself. Then later at the police station, Shapiro said he'd gone out to move the car and upon reentering his house, Ryland was standing in the doorway of the bedroom facing the hall and holding the revolver to her temple. In his first statement he told police that Ryland was basically a happy person although insecure at times. Later he reported, not entirely inconsistent with the foregoing, that she had threatened to shoot herself earlier in the year. Finally in the taped statements, Shapiro said he had not touched the gun or the body. Atomic absorption tests showed palm powder which under his version of the events could only have been there had he, in fact, handled the gun or the victim's face after the incident. In a March 12th untaped interview after the test results were in, Shapiro told Officer Humphries that possibly he had touched the gun or her body.
What impact, though, do the discrepancies in Shapiro's statements have on the state's burden to prove affirmatively that Shapiro fired the .38 revolver with the intent to kill or inflict great bodily harm upon Lavonna Ryland? We had occasion to review a case recently in which the defendant's credibility was clearly in doubt because she told four different stories concerning how her common law husband came to be fatally shot. State v. Dora Mae Savoy, 418 So.2d 547 (La.1982).[12] In Savoy, this Court refused to augment the state's insufficient evidence that the killing was not done in self defense simply because of discrepancies in the testimony of the defendant.
Considering the foregoing, while perhaps it might be concluded that the evidence does "tend" to prove that Shapiro fired the gun, the evidence similarly "tends" to prove that Ryland fired it. We therefore conclude that the state did not exclude the reasonable hypothesis that Lavonna D. Ryland's death resulted from a self-inflicted gunshot wound.
The evidence in this circumstantial case is simply insufficient as a matter of law under La.R.S. 15:438. The defendant's conviction and sentence are reversed.
Assuming without deciding that the due process clause of the federal constitution as espoused in Jackson v. Virginia is not offended by a state conviction supported by the identical evidence in this record, that constitutional consideration is irrelevant to our disposition of this case. We are constrained in a case of this sort by Louisiana law of long standing, La.R.S. 15:438, to decide as a matter of law whether every reasonable hypothesis of innocence has been excluded, assuming every fact proven that the evidence tends to prove. Upon review, we have determined that a reasonable hypothesis of innocence has not *389 been excluded in this case and have concluded that there was insufficient evidence under state law to support the conviction. The double jeopardy clause prohibits multiple punishment for the same offense, a second prosecution for the same offense after conviction, and a second prosecution for the same offense after acquittal. State v. John Anthony Guajardo, 428 So.2d 468 (1983). The double jeopardy clause bars retrial of the defendant following appellate reversal on ground of insufficient evidence, as distinguished from trial error, since "the purpose of the Clause would be negated were we to afford the Government an opportunity for the proverbial `second bite at the apple.'" State v. Hurst, 367 So.2d 1180 (La.1979) quoting Burks v. United States, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).

Decree
For the foregoing reasons, the defendant's conviction and sentence are reversed and as relates to the charges for which he was tried in these proceedings, he is ordered discharged.
CONVICTION AND SENTENCE REVERSED.
MARCUS, J., concurs and assigns reasons.
LEMMON, J., concurs and will assign reasons.
MARCUS, Justice (concurring).
Since our appellate jurisdiction in criminal cases extends "only to questions of law," when a claim is made on appellate review that a person has been convicted on insufficient evidence, whether direct or circumstantial, our inquiry should be restricted to only whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. La. Const. art. 5, § 5(C) (1974). Jackson v. Virginia, 443 U.S. 307, 309, 99 S.Ct. 2781, 2783, 61 L.Ed.2d 560 (1977). In Jackson, the United States Supreme Court noted that this inquiry does not require a court to "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.... Once a defendant has been found guilty of the crime charged, the factfinder's roll as weigher of the evidence is preserved through a legal conclusion that upon judicial review all the evidence is to be considered in the light most favorable to the prosecution."
Accordingly, I respectfully concur.
LEMMON, Justice, concurring.
While I concur in the result, I decline to subscribe to the standard expressed in the majority opinion for determining sufficiency of evidence in a case involving circumstantial proof. I also specifically reject "moral conviction" as part of a standard for sufficiency.
The proper standard for appellate review in all cases is whether the evidence, direct and circumstantial, when considered in the light most favorable to the prosecution, was sufficient for a reasonable juror to conclude that defendant was guilty of every element of the crime beyond a reasonable doubt. See La.C.Cr.P. Art. 821.
Reasonable doubt must be excluded by the totality of the evidence in order for the trier of fact to convict and for the reviewing court to affirm a conviction. Hypotheses of innocence are merely methods for the trier of fact to determine the existence of a reasonable doubt arising from the evidence or lack of evidence.
NOTES
[*] Judges Melvin A. Shortess, Burrell J. Carter, and Felix N. Savoie, Jr. of the First Circuit Court of Appeal participated in this decision as Associate Justices Ad Hoc, joined by Associate Justices Dennis, Blanche, Watson and Lemmon.
[1] See State v. Petterway, 403 So.2d 1157 (La. 1981), wherein we explained the procedure for the seven permanent members of the Court to consider rehearing applications for those opinions rendered by a split panel of four Supreme Court justices and three Court of Appeal judges, sitting as justices ad hoc.
[2] In Shapiro's second sworn statement on February 18, 1980, he said that Ryland was insecure and had threatened to shoot herself earlier that year.
[3] The defendant gave his first sworn, taped statement at 4:30 a.m. on November 25, 1979, shortly after the shooting, and the second sworn, taped statement at 1:55 p.m. on February 18, 1980.
[4] In the defendant's February 19, 1980, sworn statement he claimed there were bullets scattered all over the back seat of the car. He didn't think anything unusual of it because he kept .38 caliber bullets in the map holder of the back of each front seat.
[5] In Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), a case involving a habeas proceeding based on a claim that the defendant had been convicted in a state court upon insufficient evidence, there was no question at the trial about whether the petitioner had fatally shot the victim. The dispute centered on whether there was sufficient evidence to support a verdict finding specific intent. The majority found "[f]rom the circumstantial evidence in the record, it is clear that the trial judge could reasonably have found beyond a reasonable doubt that the petitioner did possess the necessary intent at or before the time of the killing." Supra at 324, 325, 99 S.Ct. at 2791, 2792. Of the degree of proof required to satisfy due process considerations in a circumstantial evidence situation, the majority concluded supra at 326, 99 S.Ct. at 2793:

Only under a theory that the prosecution was under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt could this petitioner's challenge be sustained. That theory the Court has rejected in the past. Holland v. United States, 348 U.S. 121, 140 [75 S.Ct. 127, 139] 99 L.Ed. 150. We decline to adopt it today.
[6] We stated the following in State v. Austin, 399 So.2d 158 at 160 (La.1981):

Regarding circumstantial evidence, R.S. 15:438 sets forth the rule that, in order to convict, the evidence must exclude every reasonable hypothesis of innocence. Under Jackson, the evidence is viewed in the light most favorable to the prosecution and from the viewpoint of a rational trier of fact. Therefore, when we review a conviction based upon circumstantial evidence, we must determine that, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have concluded beyond a reasonable doubt that every reasonable hypothesis of innocence had been excluded.
[7] The separately expressed applicable standards are as follows, as they appear in State v. Graham, 422 So.2d 123 at 129 (La.1982):

The Due Process Clause of the Fourteenth Amendment requires this court to review the evidence upon which a criminal conviction is based to determine whether it is minimally sufficient. A defendant has not been afforded due process, and his conviction cannot stand, unless, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude that the state proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Additionally, we are governed by our statutory rule as to circumstantial evidence: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence. R.S. 15:438.
[8] There is no contention that the victim was shot by someone other than defendant or herself. Compare State v. Lenon Williams, 423 So.2d 1048 (La.1982); Graham, supra; State v. Hollie, 416 So.2d 542 (La.1982).
[9] At trial, Kinard confirmed positively that the Ryland residue readings were consistent with "just background levels that you and I and anybody in here could have on their hands right now ... (w)ithout washing our hands."
[10] Dr. Patton testified at trial that he could not recall specifically giving the instruction to clean up Ms. Ryland but that it was a normal practice.
[11] Dr. McCormick testified as follows:

[M]y assumption from that is that her head incline[d] towards her left shoulder very shortly after she was shot probably in recoil from the force of the bullet.
* * * * * *
... that her head, in all probability, was on or over the paper bag when the majority of the bleeding occurred.
* * * * * *
I think the greatest possibility is that she was standing with her back to the door jam....
* * * * * *
In all probability she would fall backwards when she was shot.
* * * * * *
[A] large pool of blood on that bag, but none beneath her left arm ... suggests very strongly to me that ... when she fell, she was in that position.
* * * * * *
For her to have fired the gun in that position, she would have had to be all the way at the other side of the room, throw it across to this side of the room and then walk across the room where she should have bled on the carpet and then turn around and fall back on the gun, so I think it's very unusual.
[12] Savoy's four stories were the following. When she drove her wounded common law husband in his pick-up truck to the police station, she said that he had shot himself accidentally. Later, she said that he had been shot by another man in an argument over whiskey. The afternoon after the shooting, she first admitted that she had shot her husband in self-defense during a struggle over the gun after he had returned home drunk armed with a knife. On the witness stand at trial, she said she shot him in self defense during a struggle, but varied dramatically her account of how the struggle evolved.