423 So.2d 1048 (1982)
STATE of Louisiana
v.
Lenon WILLIAMS.
No. 82-KA-0248.
Supreme Court of Louisiana.
November 29, 1982.
Rehearing Denied January 7, 1983.
Reasons concurring in Denial of Rehearing February 9, 1983.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Ossie Brown, Dist. Atty., Joseph Lotwick, Kay Kirkpatrick, Asst. Dist. Attys., for plaintiff-appellee.
Jeffrey Hollingsworth, Asst. Public Defender, for defendant-appellant.
DIXON, Chief Justice.[*]
Defendant Lenon Williams was charged with second degree murder in violation of R.S. 14:30.1,[1] found guilty as charged and sentenced to life imprisonment without benefit of probation, parole or suspension of sentence. Defendant appeals, contending the state in this circumstantial evidence case failed to exclude every reasonable hypothesis of innocence.
The nude body of Cheryle Gaines was found in Olympia Park in Baton Rouge on Easter Sunday, April 19, 1981, by a jogger at 7:50 a.m. Her car was found later in the day underneath the Nairn Street Overpass with the doors and trunk wide open. The *1049 overpass was 3.4 miles from Olympia Park and only a short distance from the homes of the victim and the defendant.
On the night of April 18, defendant Williams was with friends at a nightclub called "The Spot" across the river in West Baton Rouge Parish. The friends who had given him a ride decided to leave, but the defendant decided not to go with them, since he was not yet ready. There were other friends in the bar that he believed would give him a ride home. He later asked Cheryle, whom he had known from school days and from working on her car at K-Mart, if she would give him a ride, and she agreed. He had been talking with her off and on in the bar and had bought her some drinks.
Joe Wright was also at "The Spot" that night. He had helped close up his father's nightclub on the East Bank and had earlier arranged with Cheryle to meet her at "The Spot." Wright's car had run out of gas earlier in the evening so he, too, was at "The Spot" without a car and also asked Cheryle (whom he knew through the Army Reserve) for a ride after talking with her in the bar. Neither Wright nor the defendant knew the other or knew that Cheryle had agreed to give the other a ride home from the club.
The three prepared to leave the bar at approximately 5:00 a.m.[2] Cheryle drove with Wright sitting in the front seat and the defendant in the back. They crossed the river and took an exit from the interstate near Wright's house so that he could pick up a gas can. Cheryle got out of the car to open the trunk and asked: "This where you live at, Man? ... It'll be hard for me to find this here again." Wright replied: "It's easy, right off Baton Rouge Avenue, Iberia Street."
The three proceeded to an open gas station where Wright got out of the car, filled the can and placed it back into the trunk. Cheryle and the defendant remained in the car. By this time the sky had begun to lighten.
When they arrived at Wright's car, he and Cheryle got out of the car; he getting a siphon hose from his car and she opening the trunk containing the gas can. Wright testified that she began to ask him about his wife since he had made her believe that he and his wife had broken up. The defendant moved from the back seat to the front, and the two drove off while Wright continued to fill his tank. By this time it was light enough that headlights were not needed.
On the way to Lenon's house, the trunk came open as the car crossed some railroad tracks. Lenon got out of the car and closed the trunk at the next stoplight.
The defendant testified that Cheryle then dropped him off in front of his house and left. He went inside, getting his pillow and blanket, undressing, and going to sleep on the floor as he usually did. His parents stated that they awoke at 6:45 a.m. and saw him sleeping.
Joe Wright testified that after Cheryle left him at his car, he finished putting the gas in and then went to the home of Jean Sheppard, one of the girls he had gone to "The Spot" with earlier that night. She came out in her robe and talked with him for about half an hour, declining his invitation to come with him to his house. This was confirmed by Ms. Sheppard's testimony. After leaving her house, Wright testified that he returned home and went to bed, not awakening until 3:30 that afternoon.
Authorities arriving at the scene where the body was found gathered the available physical evidence. Plaster casts were made of tire tracks in the area and items located near the body were picked up for analysis. *1050 These included a small piece of black carpet, a length of car stereo speaker wire, and a hair found on the victim's chest. Experimental techniques for lifting fingerprints from the skin of the victim's body were unsuccessful. As the identity of the body was unknown, a set of the victim's fingerprints was taken to aid identification.
An autopsy of the body was performed indicating strangulation by hand, rather than with a ligature, such as a rope or wire, as the cause of death. Vaginal washings showed the presence of semen from a type A secreter, indicating recent sexual intercourse with a person with blood type A.[3] Blood samples taken from the victim were determined to be type O. The time of death could not be determined any more accurately than that the death occurred within a period of six or eight hours before rigor mortis set in.[4]
The victim's car was found underneath the overpass by three children who brought certain items from the car to their father. He called the police, and when the officer arrived gave him the items and told him where the car was located. The officer went to the car, finding it with the doors, trunk and glove compartment wide open. The front of the car had been driven into a ditch. The ashtray had been broken and the front seat was stained with blood. There was a black blouse on the ground outside the driver's side door and a pair of shoes and a black wig on the floor of the car under the steering wheel, partially covering the victim's Louisiana driver's license. The contents of a purse (papers, photographs, make up, etc.) were strewn both inside and outside of the vehicle. A sample of mud from the underside of the car was taken for analysis. The car was then sealed and delivered to the state crime lab.
Joe Wright testified that he heard news reports on Monday and Tuesday that an unidentified victim had been found strangled in the park but did not learn until Tuesday afternoon that the victim was Cheryle Gaines. Realizing that he had been with her the night she died and wanting to get himself cleared, Wright sought the advice of a lawyer at the urging of friends before talking to the police. The lawyer he spoke with Tuesday evening arranged a conference with the police for Wednesday. Wright selected the defendant from a photographic display and complied with police requests for saliva, hair and blood samples.
Lenon Williams went to the New Orleans lakefront Sunday afternoon, but otherwise remained in Baton Rouge and, according to his parents, acted normally. He testified that he learned of Cheryle's death on Tuesday afternoon from a neighbor. He went inside the house and discussed the problem with his sister's boyfriend, who was a reserve deputy for the East Baton Rouge Parish Sheriff's Office. His advice was to not worry about it; that if they wanted to see him they would find him. When the police came to find him Wednesday evening, he had gone to visit with his brother. His mother had told him that the police had been there to get a picture of him, but that he was not a suspect. On his way home, he saw his father driving and heard him blowing his horn, so he stopped and talked with him. His father told him that the police were looking for him, so he went home where the police were waiting. Lenon testified that his mother was very upset, so he held her to console her before the police took him downtown. Saliva, blood and hair samples were also taken from Lenon who was later released on bond.
The results of the tests conducted on the physical evidence were introduced by the *1051 prosecution. The inside and outside of the car, as well as the contents of the car, were checked for fingerprints. Of the forty-three prints lifted, twenty-five were unidentifiable, that is, of too poor quality or too incomplete to make comparisons. Of the remaining eighteen, eight were identified. A palm print of the defendant was found on the right rear fender; a fingerprint of Joe Wright's left ring finger was found on the outside of the passenger's side door; a palm print also on the right rear fender was identified as being Mary Smith's, one of the children who found the car; the remaining identified prints belonged to the victim. Ten prints of identifiable quality did not match anyone known to have had contact with the victim's car.[5] Some of the unidentified prints were found on the inside of the driver's side window, on the inside rear view mirror, on the heater/air conditioner temperature selector and on the outside of the passenger's side door. The testimony did not indicate whether or not the unidentified prints were similar to each other. There were no prints lifted from Olympia Park where the body was found.
Saliva tests run on the samples provided by the defendant and Joe Wright indicated that each was of blood type A and that each was a secreter. Microscopic analysis of the hair found on the victim's chest was similar to the hair of the defendant.[6] The blood found on the front seat of the car was also type A. Thus, none of the tests performed excluded the defendant from consideration, though each test, had the result been different, would have excluded him.
The casts of the tire tracks were also analyzed and compared to the tires of the victim's car. One of the casts could not be used as it was an overlapping treadtwo tires having rolled over the same area. From the remaining cast, it was determined that the cast was of similar measurement and tread design as the tires on the victim's car. A positive identification could not be made due to the lack of any "accidental markings" or irregularities in the cast that could have shown that a particular tire made a particular track. While the test could have indicated that a certain tire did not make a certain track, in this case the victim's car was not excluded.
Mud samples from the victim's car and soil samples taken from the tire casts were also compared and found to be not similar. There was no testimony on the conclusiveness of this test, that is, whether the car that made the tracks could be free of traces of the soil.
The state's case is thus based on the physical evidence which did not exclude the defendant: he was the last one with the necessary physical characteristics seen alive with the victim (according to his own testimony and the testimony of another witness with the same characteristics); it was possible for him to have committed the crime since he could not confirm the time of his arrival at his home; and that the victim's car was abandoned two tenths of a mile from his house. Thus the state's case is built solely on circumstantial evidence.
In Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the United States Supreme Court held that the Fourteenth Amendment's due process guarantee required that a state criminal conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime charged beyond a reasonable doubt. Reasonable doubt may be overcome by circumstantial evidence, thus fulfilling the requirements of due process.[7] However, federal *1052 due process standards do not require that circumstantial evidence exclude every hypothesis other than guilt. Jackson v. Virginia, supra; Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954).
Circumstantial evidence in Louisiana criminal convictions is held to a higher standard. R.S. 15:438 provides:
"The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence."
The Louisiana legislature has, through this statute, provided greater protection against erroneous convictions based on circumstantial evidence than is provided by the Fourteenth Amendment. There is a possibility that the quality of evidence supporting a conviction would satisfy Jackson v. Virginia, supra, but would not satisfy the requirement of R.S. 15:438.
In this case there is no direct evidence of any element of the crime charged, other than the fact that the crime was committed. We therefore need not consider whether any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found the necessary elements of the crime beyond a reasonable doubt. Rather, the circumstantial evidence must be analyzed to determine whether it excludes every reasonable hypothesis of innocence.
The defendant testified that Cheryle dropped him off at his home and then left. There is no evidence that makes this hypothesis of innocence unreasonable; there was no evidence placing the defendant with the victim after that time nor was there any evidence suggesting that the defendant was the only one who could have committed the crime. The evidence that the defendant possessed the necessary physical characteristics does not make unreasonable the hypothesis that someone else with the same characteristics committed the crime, in the absence of evidence that the pool of people with such characteristics is small. In fact, the physical evidence does not exclude Joe Wright, also with the victim on the night she was murdered. In addition, the unidentified fingerprints in the car suggest that some unknown person might have been in contact with the car; the failure of the soil from the park where the body was found to match the soil under the victim's car suggests that a second car might have been used to transport the body to the park.
The state, therefore, has failed to prove beyond a reasonable doubt that the defendant committed this crime; the circumstantial evidence relied upon by the state does not exclude every reasonable hypothesis of innocence.
Where there is insufficient evidence of the crime charged, the double jeopardy clause of the Fifth Amendment precludes a second trial. Burks v. United States, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); State v. Hoffer, 420 So.2d 1090 (La.1982). A judgment discharging the defendant is therefore required.
For the reasons assigned, the defendant's conviction and sentence are reversed, and the defendant is ordered discharged.
WILLIAMS, J., and BYRNES, J. Ad Hoc, dissent.
WILLIAM J. BYRNES, III, Justice Ad Hoc, dissenting and assigning reasons:
I must respectfully dissent. The majority feels that because the lab tests performed on the physical evidence do not positively identify the defendant, other reasonable hypothesis of innocence are not ruled out. This is a factual conclusion with which I cannot agree. The fact that the victim was last seen with the defendant and that her car was found less than one block from the defendant's home, combined with the fact that the lab tests failed to exclude the defendant from the class of possible suspects could, in my opinion, lead a rational trier of fact to the conclusion that every reasonable hypothesis of innocence was excluded. I would affirm the conviction.
LEMMON, Justice, Concurring in Denial of Rehearing.
In my opinion the federal due process standard announced in Jackson v. Virginia is the applicable standard in reviewing the sufficiency of evidence. La.R.S. 15:438 is primarily a standard by which juries are instructed, while the Jackson standard is more properly the ultimate standard of appellate *1053 review, applicable in all cases, including circumstantial evidence cases.[1]
Nevertheless, under either standard, the majority reached the correct result.
NOTES
[*] Judges Charles R. Ward, William H. Byrnes, III and David R.M. Williams of the Court of Appeal, Fourth Circuit, participated in this decision as Associate Justices pro tempore, joined by Chief Justice Dixon and Associate Justices Calogero, Dennis and Watson.
[1] R.S. 14:30.1 provides:

"Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2) When the offender is engaged in the perpetration or attempted perpetration of aggravated rape, aggravated arson, aggravated burglary, aggravated kidnapping, aggravated escape, armed robbery, or simple robbery, even though he has no intent to kill or to inflict great bodily harm.
Whoever commits the crime of second degree murder shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence."
[2] Many of the witnesses testifying to the events of April 18 and 19 estimated the times when events occurred and the length of time that the events took, such as driving from one place to another. Many estimates were reconstructed later based on the lightness of the sky and weather bureau information that sunrise on April 19, 1981 occurred at 5:33 a.m. Accurate times were known by the jogger who carried a watch and by the defendant's parents who receive a wake-up call every Sunday morning at 6:45 a.m. from defendant's grandmother preparing to leave work.
[3] A secreter is a person whose blood type can be determined from other body fluids such as saliva and semen. Expert testimony indicated that approximately 80% of the population are secreters. There was no testimony on the percentages of the population with the various blood types.
[4] There was no direct testimony offered to establish the time the muscles of the body became rigid. Hiller Moore, who arrived at the scene at about 8:30 a.m., testified that when he took a set of the victim's fingerprints, approximately two to three hours after he began his investigation, rigor mortis had not yet set in, though the fingers had begun to curl and stiffen.
[5] The police officers testifying as to the chain of custody of the car emphatically stated that the area where the car was found was sealed off from the moment the officers arrived on the scene, and that no one touched or was even allowed near the car.
[6] The testimony did not indicate whether the hair on the victim's chest was compared to the sample provided by Joe Wright. There was also no testimony concerning the percentage of the population that would have hair of similar characteristics nor any evidence indicating that the hair was tested against hair of the victim herself.
[7] "Circumstantial evidence in this respect [overcoming reasonable doubt] is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in both instances, a jury is asked to weigh the changes that the evidence correctly points to weighing the probabilities. If the jury is convinced beyond a reasonable doubt, we can require no more." Holland v. United States, 348 U.S. 121, 140, 75 S.Ct. 127, 136, 99 L.Ed. 150 (1954).
[1] The Jackson standard, as opposed to the standard set forth in La.R.S. 15:438, was relied upon by the Legislature in adopting La.C.Cr.P. Art. 821 (as enacted by Acts 1982, No. 144), which sets forth the standard for appellate (or trial) courts in receiving evidence for the purpose of a motion for a postverdict judgment of acquittal.