BOUTALL, Judge.
Appellant Gerald Grabert, Jr. was indicted for second degree murder, LSA-R.S. 14:30.1, and found guilty as charged. He received the mandatory sentence of life imprisonment without benefit of parole, probation, or suspension of sentence, and now appeals both his conviction and sentence.
Appellant assigns two errors for our review: whether the trial court erred in permitting the prosecutor to elicit testimony concerning other bad acts, and whether the evidence presented was sufficient to justify a verdict of second degree murder. We affirm.
FACTS
On December 21,1982, Janice Tucker left her husband at home while she went shopping with their daughter. Returning at 7:30 p.m., Mrs. Tucker glanced in a bedroom window and saw that the room was in disarray. Mrs. Tucker ran to a neighbor’s house and called the police. Two deputies from the Jefferson Parish Sheriff’s Office arrived on the scene to find the body of Claude Tucker, Mrs. Tucker’s husband, in the recreation room, lying on the floor in front of the pinball machine. He had been shot once in the back and once in the chest. A search of the scene revealed no signs of forced entry; the killer apparently had been admitted into the residence by Claude Tucker and, after the murder, left via a rear door, which was found open. There was blood on the face of the pinball machine and some of the victim’s teeth were loose and broken, indicating he had been playing pinball immediately before he was shot. Investigation also revealed that two gold chains, a money clip, and costume jewelry had been taken from a dresser in the ransacked bedroom. There were no immediate leads as to the identity of the killer.
One month later, a Mary Mataya contacted Detective Trapani of the Jefferson Parish Sheriff’s Office and provided information implicating the defendant in the murder of Tucker. Mataya turned over two gold chains given to her by the defendant on the night of the murder. A warrant was issued and the defendant was arrested for the murder of Claude Tucker.
ASSIGNMENT OF ERROR NO. 1
Appellant first contends the trial court erred in permitting the prosecutor to elicit testimony concerning other bad acts, specifically the use of illegal drugs. He further contends this testimony was prejudicial enough to require reversal of his conviction.
The situation leading to this testimony arose as follows: A major contention by the defendant at a pretrial motion to suppress the confession and at the trial itself was that his confession was not freely giv *1329 en, but was “beaten out of him” by Detective Trapani. In support of this contention, the defendant relied heavily on the fact he was admitted into Charity Hospital four days after his arrest because there was blood in his urine. The defendant introduced hospital records and the testimony of Dr. Jerry Sullivan, a urologist at Charity Hospital, as proof that the blood in his urine was caused by trauma to his back which bruised his kidneys. Defendant alleged that this “trauma” was the result of being struck fifteen to twenty times by Trapani. On cross-examination of the defendant at trial, the State sought to bring out other possible causes of blood in the urine. Referring to admittance notes prepared when the defendant sought medical attention at Charity Hospital, the prosecutor asked the defendant:
Q. Do you recall telling the people at Charity that you had a history of using drugs?
A. Yes, sir.
Q. Cocaine, quaaludes, speed, demoral, heroin, T’s and Blues’s?
A. Yes, sir.
(Vol. Ill, Tr. p. 183).
Defense counsel immediately objected to the questions on the grounds they referred to “other crimes” and moved for a mistrial. The State asserted that the questions were relevant in showing other possible causes of blood in the defendant’s urine, thereby negating the defendant’s contentions that the condition was a result of a beating. The trial judge overruled the objection and denied the motion for mistrial on the basis the testimony was relevant.
Upon further cross-examination of Dr. Sullivan, the State elicited testimony that a fall or strenuous exercise could have brought on the defendant’s kidney condition, and continued as follows:
Q. What about drugs?
A. Drugs will cause hematuria [blood in urine].
Q. Does the report indicate a history of drug use by the defendant ...
(Objection by defense counsel overruled for the same reasons expressed when the evidence of drug usage was elicited from the defendant.)
Q. Go ahead, doctor. Does it say anything about drugs?
A. Yes. When he told the medical student on admission to the hospital ... Currently he does not do drugs. Three years ago he smoked ten to fifteen joints a day. At that time he was also doing various drugs including cocaine, quaaludes, speed, percodan and demo-ral. He has used heroin once and T’s and Blues’s twice.
Q. Would that type of drug use cause this problem or could it cause this problem?
A. It could cause this problem.
(Vol. IV, Tr. pp. 11-13).
LSA-R.S. 15:280 provides that when a witness has been sworn and has testified to any single fact in his examination in chief, he may be cross-examined upon the whole case. The prosecutor has the right to rebut the evidence adduced by the defendant, LSA-R.S. 15:282, and in such endeavor may cross-examine witnesses offered by the defense concerning any relevant or material issue. State v. James, 394 So.2d 1197 (La.1981). Relevant evidence is evidence which tends to show the commission of the offense and the intent, or tending to negative the commission of the offense and the intent. LSA-R.S. 15:441.
The general rule is that evidence of extraneous offenses is inadmissible, La.C. Cr.P. art. 770; but matters which are relevant to issues before the jury should not be excluded merely because they show the accused has committed other offenses. State v. Constantine, 364 So.2d 1011 (La. 1978).
The instant issue is similar to the one presented in State v. James, supra, where the defendant used certain medical records and testimony of a psychiatrist to establish his insanity at the time of the commission of the offense charged. The State, in its efforts to rebut this evidence, *1330 cross-examined the doctor and used the same reports as were used on direct. Included in the report was a reference to another crime which was not before that court. Defense counsel objected and moved for a mistrial, which was denied. The court, after analyzing the law, noted one of the relevant issues before the jury was the mental condition of the defendant at the time of the commission of the crime, which defendant sought to establish through these medical records and the doctor’s testimony. The State used this same evidence to rebut this testimony in its cross-examination. The court concluded the testimony was admissible “in spite of the oblique reference to some other crime” because the testimony was clearly relevant to one of the central and material issues. Id. at 1203.
We feel the instant case is very similar to James and that the same legal principles apply. The defendant in both cases used certain evidence introduced through a witness to prove a material fact at issue, and the State used the same evidence in cross-examining that witness to rebut the testimony elicited on direct examination. In so doing, testimony of other crimes was mentioned. In James, this was found to be relevant and admissible testimony, and we reach the same conclusion herein.
This assignment lacks merit.
ASSIGNMENT OF ERROR NO. 2
Appellant next contends the evidence is insufficient to justify a verdict of guilty of second degree murder. We disagree for the following reasons.
The standard for determining the sufficiency of the evidence in a criminal case was established in Jackson v. Virginia, 443 U.S. 307, 320, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), which held: “The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt”.
LSA-R.S. 14:30.1, second degree murder, provides in pertinent part:
Second degree murder is the killing of a human being:
(1) When the offender has a specific intent to kill or to inflict great bodily harm; or
(2) When the offender is engaged in the perpetration or attempted perpetration of ... aggravated burglary ... armed robbery, or simple robbery, even though he has no intent to kill or to inflict great bodily harm.

Specific intent is defined as the state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. LSA-R.S. 14:10(1). Even though intent is a question of fact, it need not be proven as a fact, it may be inferred from the circumstances of the transaction. LSA-R.S. 15:445.
Appellant argues the evidence presented against him is just as probative of another’s guilt (his father) as it is of his guilt, and that as a matter of law, a conviction cannot stand when the evidence offered against the accused is equally probative of another’s guilt. Appellant refers us to the case of State v. Williams, 423 So.2d 1048 (La.1982).
In Williams, two men picked up a girl in a bar and she gave them each a ride home. The next day, she was found raped and strangled in a park. Her car was found later that day some distance away from the park yet a short distance away from the home of each of the two men. One of the men called the police, saying that he had heard of the killing and that the victim and the defendant left together after dropping him off at his home. The defendant testified the victim dropped him off at his home and then left alone. There was scientific evidence introduced at trial which pointed equally to each of the men.
Although appellant strongly urges the application of Williams, we find it is not applicable to the instant case. Williams only applies to the situation where purely circumstantial evidence is offered to convict a defendant. Such is not the case *1331 herein; both direct and circumstantial evidence were introduced against the defendant.
The direct evidence introduced against the defendant included the following. Mary Mataya testified defendant came over to her house the night of the murder and told her:
... He told me he shot the man once in the back of the head, and once in the chest to make sure that he was dead. And he said that he was playing a pinball machine at the time. And then he said that he stole the jewelry and so forth to make it look like it was a robbery and so forth. And he said the man had shot at him first and he had burned — he kept complaining he had burns on his hands, powder burns. I am not sure if it was, because I really didn’t pay too much attention to it. He had brought my attention to his shoes, that he had blood on his shoes, like splashes. I really don’t know what it looked like. It was just — unless it splatters, and he just kept on telling me about the same thing over and over again.
(Vol. Ill, Tr. pp. 18-19).
Mataya also testified defendant gave her two gold chains that night. It was conclusively established at trial these two chains had been stolen from the Tuckers’ residence. It was these two chains which she turned over to Detective Trapani one month after the murder. Anthony Villani, a friend of the defendant, testified the defendant told him he was going to kill someone and later told Villani he did it. Another friend of defendant’s, Gary Pfiffner, testified that on the day of the murder, he drove the defendant into New Orleans to pick up’ a car rented by the defendant’s father. While in the car, the defendant told Pfiffner “he was going to do it today”. Pfiffner knew what the defendant meant because the defendant had previously mentioned killing someone for his father for $5,000.00. Pfiffner related that the day before the murder, he had seen the defendant carrying a small caliber semi-automatic pistol which the defendant “got from his father”. Later on the night of the murder, Pfiffner saw the defendant and noticed that he had black stains on his hands and blood on his shoes. The defendant told Pfiffner “he did it”.
The additional evidence introduced against defendant included his own statement, in which he blamed the shooting on his father, but unequivocally established he was present at the murder scene, he knew how entry was gained into the Tucker house, what the victim was doing immediately prior to the murder, what was taken from the scene, and how the escape was accomplished. Defendant took the stand in his own behalf at trial and testified he was bowling the night of the murder and his father corroborated this. Other bowlers present at the bowling alley on the night in question also corroborated this testimony. However, the state did show that the defendant had enough time to sneak out of the bowling alley, drive to the Tuckers’ residence, commit the murder and return to the bowling alley without being missed.
Thus, it is clear that the direct evidence, when considered in conjunction with the circumstantial evidence, could have convinced a rational trier of facts, viewing the evidence in the light most favorable to the prosecution, that the essential elements of second degree murder had been proved beyond a reasonable doubt. Although Gra-bert’s defense was that his father killed Claude Tucker, and some evidence was introduced in an attempt to support this, the only question before us is the sufficiency of the evidence used to convict Gerald Gra-bert, Jr. Obviously the jury was faced with a credibility choice, and the jury chose to believe the State’s witnesses. It is not the function of the reviewing court in a criminal case to evaluate the credibility of witnesses and overturn factual determinations of guilt. State v. Cockerham, 442 So.2d 1257 (La.App. 5th Cir.1983) and State v. Richardson, 425 So.2d 1228 (La.1983). Our review is limited to questions of law. State v. Bearden, 449 So.2d 1109 (La.App. 5th Cir.1984) and LSA — Constitution Art., 5 *1332 Sec. 10 (1974). We find the evidence is sufficient to support the verdict.
Accordingly, this assignment lacks merit.
For the reasons set forth above, we affirm.
AFFIRMED.