STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

25-561

STATE OF LOUISIANA

VERSUS

KERRI K. THIBODEAUX

**********

APPEAL FROM THE
THIRTY-SIXTH JUDICIAL DISTRICT COURT
PARISH OF BEAUREGARD, NO. CR-2024-263
HONORABLE MARTHA ANN O'NEAL, DISTRICT JUDGE

**********

LEDRICKA J. THIERRY
JUDGE

**********

Court composed of Jonathan W. Perry, Ledricka J. Thierry, and Wilbur L. Stiles, Judges.

CONVICTION AFFIRMED; SENTENCE VACATED; REMANDED
WITH INSTRUCTIONS.

James R. Lestage, District Attorney
36th Judicial District/Beauregard Parish
124 South Stewart Street
DeRidder, LA 70634
(337) 463-5578
COUNSEL FOR APPELLEE:
    State of Louisiana

**S. Christie Smith**
**SmithAdvocates, LLC**
**300 Courthouse Street**
**P.O. Drawer 1528**
**Leesville, LA 71496**
**(337) 239-2244**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Kerri Thibobeaux**

**THIERRY, Judge.**

In this criminal case, Defendant appeals her conviction of attempted cruelty to a juvenile, in violation of La.R.S. 14:27 and 14:93. For the following reasons, we affirm the conviction, but vacate Defendant's sentence and remand for resentencing.

## FACTS AND PROCEDURAL HISTORY

On February 28, 2024, while under the care of Defendant, Kerri Thibodeaux, the victim, V.K., who was eleven months old at the time, sustained significant bruising on her buttocks. Defendant denied inflicting the bruising on V.K. and alleged it was caused by V.K. falling down on some bricks in Defendant's yard while they were outside playing. It was discovered through a search of Defendant's cell phone, that websites concerning bruising in an eleven-month-old, whether discolored buttocks constituted abuse, when discipline becomes abuse, spanking that leaves bruises, and what happens next when someone files a report alleging physical abuse were viewed. Both V.K.'s mother and her great grandmother, with whom V.K. and her mother lived, testified that they believed a handprint was visible in the bruising.

The State eventually charged Defendant with cruelty to a juvenile, in violation of La.R.S. 14:93, alleging she intentionally mistreated a minor child, V.K., and that the injuries resulted in unjustified pain or suffering. Defendant pled not guilty. Trial proceeded before a six-person jury, with the jury unanimously agreeing on a verdict of attempted cruelty to a juvenile, a violation of La.R.S. 14:27 and 14:93. The court sentenced Defendant to a suspended sentence of five years at hard labor and five years of supervised probation subject to general and specific conditions, including home incarceration. Defendant was also imposed with a $1,000.00 fineDefendant is now before this court appealing her conviction and asserts the following assignments of error:

1. Defendant contends the evidence presented by the State was insufficient to convict her of attempted cruelty to a juvenile because it did not negate a reasonable hypothesis of innocence–that the injury occurred by V.K. plopping down on the bricks, as alleged by Defendant.

2. Appellate counsel contends she was unable to locate testimony that the crime occurred in the parish of prosecution.

## ANALYSIS

### *Sufficiency of the Evidence*

In her first assignment of error, Defendant contends the evidence presented by the State was insufficient to convict her of attempted cruelty to a juvenile because it did not negate a reasonable hypothesis of innocence; that the injury occurred by V.K. plopping down on the bricks, as alleged by Defendant.

*Evidence Presented at Trial.*

Matilyn Kern, who was the mother of V.K., testified that on February 28, 2024, when V.K. was ten to eleven months old, she needed a babysitter while she went to work. Neither Matilyn's mother nor V.K.'s father could keep her, so she called Defendant who had babysat for V.K. previously on a few occasions. Defendant agreed to keep V.K., and kept Matilyn updated about how V.K. was doing, as she normally did when she kept her. However, according to Matilyn, on this day, the updates expressing that V.K. was happy and content were excessive. When Matilyn was asked if Defendant had done that in the past, she replied, "Not as much, no."

Not long before Matilyn was to pick up V.K., Defendant asked whether V.K. could stay the night. Matilyn declined the invitation. Defendant then told Matilyn that there had been an incident with V.K. "plopping down on some bricks." Matilyn said she reassured Defendant, telling Defendant that she was sure it was ok, that babies fall. When Matilyn arrived to pick up V.K., she said V.K. was really tired and

"almost relieved" to see her. Matilyn pulled V.K.'s diaper back and saw that V.K.'s bottom was a little red on the top. While Matilyn was at Defendant's house, Defendant showed her the bricks, which were landscaping bricks. After going straight home, Matilyn and her grandmother removed V.K.'s diaper and saw that V.K.'s entire bottom was purple. She reached out to Defendant for an explanation other than V.K. plopping down on the bricks, but Defendant gave none.

Matilyn testified that she sent Defendant one or two pictures of V.K.'s bottom, and Defendant acknowledged it looked worse than she thought, and she apologized for it happening on her watch. Defendant asked, and Matilyn agreed, to Defendant coming to her house to talk. Defendant, her husband Brian (who was Matilyn's uncle), and Defendant's boys arrived. According to Matilyn, V.K. acted no differently when Defendant arrived, but Defendant appeared worried. Defendant brought one of V.K.'s favorite toys which V.K. grabbed and "went on about her [V.K.'s] business." According to Matilyn, Defendant did not normally bring toys over to her house.

Concerned over what she saw, Matilyn consulted Sylvester Denmond, her sister's father-in-law, who was a law enforcement officer. Matilyn was told to report the incident. She subsequently made a report of the incident to Detective Buckley of the Beauregard Parish Sheriff's Office the weekend after the incident occurred. Pictures of V.K.'s bottom as well as text messages Matilyn exchanged with Defendant were provided to Detective Buckley. The photographs as well as the text messages were admitted at trial and published to the jury.

During Matilyn's testimony, the State introduced a photograph of the bruising on V.K.'s bottom taken February 29, 2024, the day after the incident; a photograph of the bruising taken March 1, 2024, the following day; and a photograph of the bruising taken March 2, 2024, four days after the incident.

3

The following text messages between Defendant and Matilyn were read at trial to the jury:

> **Defendant**: And Brian helps pick up Wessy from school I'm not busy. That's why I was offering!  And also thinking it may be easier to stay the night but I get momma wants her baby

> **Matilyn**:  yes I do lol. been a day. need her

> **Defendant**: Not to worry you but we were outside and she plopped down on a brick we have outside. She like plopped plopped. On her booty but poor thing looked like it hurt and her booty is still a little red She's a okay. Taking them in to get cleaned up now

Matilyn stated it wasn't until she declined Defendant's offer to have V.K. stay the night that she was told V.K. plopped down on the bricks.  The text conversation, which occurred shortly after Matilyn arrived home, continued as follows:

> **Matilyn**: you sure this is from the bricks?? She didn't fall off the bed or anything? Get pushed? The bruise is looking really bad already.

> **Defendant**: Yes ma'am. She never fell from the bed. She never cried or had trouble with porch stairs. And she was never once without arms reach when the children were up playing. She liked the stuffed animals while boys played with trucks. William was a big help with her. Westin was loud playing with her (dinosaur) but never ever did any touching other than ... how do I say this.. he pretends he's a cat and snugs his head gently u stead of hugging LOL.

> But no she never fell off my bed. It was totally tucked with large pillows and safe place for her to lay. Aside from bricks only time she dried [sic] was when she was told no (crawling under coffee table didn't want her head bonked.. which she did do one time but was fine 2 seconds after).

> Is there anything I can do? Would you like me to come over and talk in person?

> Do you have a baby carrier? If not, and I get to watch her again I will buy one that way she is totally on me while I'm tending to the kids doing their wild boy stuff

> **Matilyn**:  i have one

> **Defendant**:  And more info. It did not bruise immediately. It was red red but bruising didn't happen until you were nearly to the house and I changed her for ya.

I do know that bruises get worse with time. If her whole bottom is bruised up or she's sore maybe extra time in a warm bath and compression? Christ I'm so sorry you even have to ask this stuff

Open book here. Mom to mom. You can speak to me about anything and anyway

**Matilyn**: yeah her whole butt is bruised and it's okay just wanna know what happened. Something may have happened when you weren't looking. she's quick. but I don't think it was from the bricks. she plops down all the time hard at the house all the way down and it never bruises like that. i'm just worried that there's something going on like internally maybe idk. i'm just kinda freaked out lol

i'm not trying to say you're lying at all.

it's just this is way worse than her plopping down

**Defendant**: Normally things like that internal would also show on spine and thighs

. . . . [Matilyn sent picture of V.K. to Defendant]

Her diaper was fresh so there wasn't much padding the bricks were uneven

OMFG

Her whole booty

**Matilyn**: yes

like around the sides too

**Defendant**: Send pic Matti

**Matilyn**: i will when i take her clothes off again. she's [sic] was pissed at me

**Defendant**: That's big bruises

**Matilyn**: i know

**Defendant**: Can Brian and I come over please

If you don't mind

**Matilyn**: it's up to yall

**Defendant**: We're on our way shortly

**Matilyn**:  kk

The following day, after Matilyn sent a picture of V.K.'s bottom to Defendant, the text conversation continued:

**Matilyn**:  this is bad

**Defendant**:  My god. Is she hurting? What did the dr say????

I know bruising gets worse as days goes on but like… the redness too. It looks worse today than 2 days ago!

Can you do one in light without flash?

Is her little back/spine area bruised or a shadow?

**Matilyn**:  that's just a shadow

**Defendant**:  Is there any cream or like lidocaine spray or anything I can bring for her? Is she hurting??

**Matilyn**:  no she's okay. just looks worse than it is

Matilyn testified that to comfort Defendant, she said the bruise looked worse than it was.  The conversation continued:

**Defendant**:  Well it looks terrifying and I don't understand how the whole booty is that way

Are you working today?

Going to commissary. Formula diapers and wipes are majorly less expensive there. Want a pack or two

Are you sure she couldn't use some lidocaine lotion or anything. I'm just so sorry you're dealing with that and it's on my watch. I feel like such a shit

I understand. I wish I could do more to help. Please know my heart hurts for yours and I am truly sorry she has marks like that on her "my watch". I'm so sorry mattie.

The case was assigned to Detective Kassidy Hagan, and Matilyn provided her pictures.  When Matilyn was shown two pictures taken on February 28, 2024, she said she could see fingerprints on V.K.'s bottom and pointed it out to the jury.  When shown a photograph taken March 2, 2024, Matilyn noted the fingerprints were still

6

visible. Lastly, when shown a photograph taken five days after the incident, Matilyn said, "you can almost make out what looks to be an entire hand like this. It's not perfect but it's the shape of a hand." She testified that she believed it to be the size of an adult's hand.

Matilyn testified that after the incident, V.K. acted differently toward people wearing hats. She said that one day her sister entered her house wearing a ball cap, and V.K. "lost her mind" until Matilyn's sister removed her hat and V.K. could see that it was her. Matilyn testified that she did not make the connection at first but later realized Defendant often wore a baseball cap. Matilyn said she felt guilty for letting V.K. stay over at Defendant's house, and this incident had torn her family apart.

On cross-examination, Matilyn testified that Defendant had taken care of V.K. before, and on one occasion, V.K. had spent the night. On the day of the incident, Matilyn was under the impression that her uncle was at work, and Defendant was at home with her two boys who were about three or four years old. Matilyn testified that she and her grandmother took V.K. to the pediatrician the morning after the incident. V.K. was examined, and Matilyn was told to come back if something else developed. Matilyn did not take V.K. back to the doctor. To Matilyn's knowledge, the pediatric clinic did not report anything to law enforcement.

Matilyn confirmed that the marks on V.K.'s bottom resolved the first week of March, and although she did not specifically know what caused the bruising, she suspected it was a human hand. Matilyn was asked whether she asked anyone other than Defendant whether they had hurt V.K. and she responded, "No, there was no indication that anybody else would have hurt her."

On re-direct examination, Matilyn said she saw the bricks V.K. allegedly plopped down on, and there was nothing on V.K.'s bottom that resembled brick marks nor linear marks.

Detective Kassi Hagan, a detective at the Beauregard Sheriff's Office, testified that she was assigned to this case. She reviewed the photographs Matilyn had taken. Detective Hagan identified what she believed to be fingerprints on V.K.'s bottom. However, she did confirm that she had no special training in recognizing fingerprints and that this was just her opinion.

As part of her investigation, Detective Hagan interviewed Defendant after she was advised of and waived her rights. Defendant's interview was shown to the jury. In the video statement, Defendant said she offered for V.K. to spend the night before V.K. plopped down on the bricks.

Detective Hagan testified that Defendant's story was not consistent with the text messages Matilyn had sent her in these respects:

> A.     She had inconsistencies with the bruising. At first it was [V.K.] left with some bruising, and by the end of the interview she stated that [V.K.] had a slight redness.
>
> She was also very matter of fact with her time frames except when the incident took place.
>
> . . . .
>
> A.     So she stated that the plopping happened about 3:30, and she stated she immediately let Matilyn know. Later we find out that she didn't text Matilyn about the incident until 4 o'clock. And when we pressed her on it, she stated that maybe she was looking at her phone or along those lines. So, she switched up from it happening at 3:30 to then I was on my phone, and it just didn't stay consistent. She was very precise about the entire day to the minute until that incident.

After the interview, Defendant was arrested. A search warrant was obtained, and her cell phone was taken. Detective Hagan testified about an extraction report made from an analysis of Defendant's phone, indicating websites on the following topics were visited on her phone as a result of searches she typed: bruising in children ages 1 to 5, discolored buttocks abuse or not, consequences for bruising an 11-month-old buttocks, when does discipline become abuse, 11-month-old can they be

8

bruised from spanking, bruised buttock 11-month-old, someone filed a report saying I physically abused a child what happens next, and spanking that leaves bruises.

According to Jerry Cox, the state police tech support officer who performed the search of Defendant's phone, one of the web history results had been deleted. Detective Hagan confirmed that in her interview, Defendant never mentioned disciplining or spanking V.K., nor did she mention the online search she conducted. Defendant did not search for anything about bricks bruising children or inappropriate bruises. The things she searched concerned discipline, spanking, and abuse. On cross-examination, Detective Hagan testified that the report did not reveal when the searches were conducted, and she acknowledged it was possible the searches could have taken place after Defendant knew she was a suspect in the case.

Detective Hagan identified the photograph of the bricks that Defendant said V.K. plopped down on, noting that the bricks were quite tall and V.K. had short legs. Thus, V.K.'s fall was not very far, according to Detective Hagan. She testified that no injuries on V.K.'s bottom matched the bricks, and none showed a straight horizontal line. Detective Hagan confirmed that she did not request the physician's records in this case; Matilyn provided them to her.

Lastly, the State called Kaye Kern, Matilyn's grandmother. Ms. Kern testified that Matilyn and V.K. were living with her at the time of the incident. She observed the bruising on V.K.'s bottom and concluded that it was from "very[,] very hard spanking." She did not suspect a fall caused the bruising because there was no point of impact, and V.K.'s whole bottom was bruised. According to Ms. Kern, as the bruising faded, there was a handprint with an outline of the palm and fingers.

### Defendant's Arguments

Defendant alleges that the State failed to negate the hypothesis that the injury occurred by V.K. plopping down on her bottom. Defendant notes that no medical

experts were called nor medical testimony adduced about the cause of the injury. Next, Defendant points out that the jury's verdict of attempted cruelty to a juvenile is inconsistent with the evidence because there is no doubt that the injury occurred. Defendant contends that if the jury believed V.K. was injured by Defendant, the logical verdict would have been guilty. Finally, Defendant notes that the court erred in allowing the witnesses to testify there was a handprint when no expert testimony was offered. Defendant also notes the physician did not report any abuse.

*Applicable Law*

Louisiana Revised Statutes 14:93(A)(1) defines cruelty to juveniles as "[t]he intentional or criminally negligent mistreatment or neglect by anyone seventeen years of age or older of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child."

> The term "mistreatment" as used in the statute means abuse. *State v. Woods*, [44,491, 44,492, (La.App. 2 Cir. 8/19/09), 16 So.3d 1279, *writ denied*, 09-2084 (La. 4/9/10), 31 So.3d 380]. In addition to the requisite intent or negligence, mistreatment or neglect, the state must prove that the mistreatment or neglect caused unjustifiable pain and suffering. *State v. Joseph*, [11-1583 (La.App. 3 Cir. 6/13/12), 94 So.3d 922, *writ denied*, 12-1652 (La. 3/1/13), 108 So.3d 783]. A victim need not have sought medical attention in order to find unjustifiable pain and suffering. *State v. C.S.D.*, 08–877 (La.App. 3 Cir. 2/4/09), 4 So.3d 204.

*State v. Ricks*, 49,609, p. 18 (La.App. 2 Cir. 1/14/15), 194 So.3d 614, 625.

> Louisiana Revised Statutes 14:27 provides in pertinent part:
>
> A.      Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
>
>          . . . .
>
> C.      An attempt is a separate but lesser grade of the intended crime; and any person may be convicted of an attempt to commit a crime, although it appears on the trial that the crime intended or attempted was actually perpetrated by such person in pursuance of such attempt.

10

In *State v. Mack*, 13-1311, pp. 8–10 (La. 5/7/14), 144 So.3d 983, 988–89 (alterations in original), the supreme court discussed an appellate court's role in reviewing the sufficiency of the State's case which is based on circumstantial evidence:

> Underlying the controversy between the state and defendant in the present case is the question of how much deference a reviewing court in Louisiana must give to the jury's verdict in a case involving primarily or exclusively circumstantial evidence. In *Wright v. West*, 505 U.S. 277, 296, 112 S.Ct. 2482, 2492, 120 L.Ed.2d 225 (1992), the Supreme Court emphasized just how narrowly the Court intended its seminal decision in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) to apply:
>
> > In *Jackson*, we emphasized repeatedly the deference owed to the trier of fact and, correspondingly, the sharply limited nature of constitutional sufficiency review. We said that '*all of the evidence* is to be considered in the light most favorable to the prosecution,' 443 U.S. at 319, 99 S.Ct. at 2789 (emphasis in the original); that the prosecution need not affirmatively 'rule out every hypothesis except that of guilt,' *id.*, at 326, 99 S.Ct. at 2792; and that a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution,' *ibid*.
>
> When this Court first implemented the *Jackson* standard, we indicated at one time that Louisiana's traditional rule with respect to circumstantial evidence as incorporated into La.R.S. 15:438, that the evidence must negate every reasonable hypothesis of innocence, might change the terms of analysis and even add a second level of review. *See e.g., State v. Shapiro*, 431 So.2d 372, 388 (La.1982) (on reh'g) ("Assuming without deciding that the due process clause of the federal constitution as espoused in *Jackson v. Virginia* is not offended by a state conviction supported by the identical evidence in this record, that constitutional consideration is irrelevant to our disposition of this case. We are constrained in a case of this sort by Louisiana law of long standing, La.R.S. 15:438, to decide as a matter of law whether every reasonable hypothesis of innocence has been excluded, assuming every fact proven that the evidence tends to prove."); *State v. Williams*, 423 So.2d 1048, 1052 ("The Louisiana legislature has, through this statute, provided greater protection against erroneous convictions based on circumstantial evidence than is provided by the Fourteenth Amendment. There is a possibility that the quality of evidence supporting a conviction would satisfy *Jackson v. Virginia*, [ ]but would

not satisfy the requirement of R.S. 15:438.")). We subsequently clarified, however, that "[u]ltimately, all evidence, both direct and circumstantial, must be sufficient under *Jackson* to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. Due process requires no greater burden." *State v. Wright*, 445 So.2d 1198, 1201 (La.1984). Thus, the rule of La.R.S. 15:438 does not supplant *Jackson's* objective test of evidentiary sufficiency from the point of view of a hypothetical rational trier of fact, although it does "provide[ ] an evidentiary guideline for the jury when considering circumstantial evidence and facilitates appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt." *Wright*, 445 So.2d at 1201.

To preserve the role of the fact finder, *i.e.*, to accord the deference demanded by *Jackson*, this Court has further subscribed to the general principle in cases involving circumstantial evidence that when the fact finder at trial reasonably rejects the hypothesis of innocence advanced by the defendant, "that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." *State v. Captville*, 448 So.2d 676, 680 (La.1984). A reasonable alternative hypothesis is not one "which could explain the events in an exculpatory fashion," but one that "is sufficiently reasonable that a rational juror could not 'have found proof of guilt beyond a reasonable doubt.' " *Id.* (quoting *Jackson*). Thus, in all cases, the *Jackson* standard does not provide a reviewing court with a vehicle for substituting its appreciation of what the evidence has or has not proved for that of the fact finder. *State v. Pigford*, 05–0477, p. 6 (La.2/22/06), 922 So.2d 517, 521; *State v. Robertson*, 96–1048 (La.10/4/96), 680 So.2d 1165, 1166. A reviewing court may impinge on the "fact finder's discretion . . . only to the extent necessary to guarantee the fundamental due process of law." *State v. Mussall*, 523 So.2d 1305, 1310 (La.1988).

Further, in *State v. Schrader*, 518 So.2d 1024, 1034 (La.1988), the supreme court stated:

The appellate court was correct insofar as it held that, absent a contemporary objection, a defendant may not complain if jurors return with a legislatively approved responsive verdict, whether or not *that* verdict is supported by the evidence. This Court has indicated that such a result both recognizes the legitimacy of a "compromise" verdict and comports with the responsive verdict scheme of La.C.Cr.P. art. 814. *State ex rel. Elaire v. Blackburn*, 424 So.2d 246 (La.1982). However, and as *Elaire* made clear, there is an important proviso to this rule: the evidence must be sufficient to sustain a conviction on the charged offense. *Id.* at 251.

*Discussion*

After a thorough review of the record, we find the evidence presented in this case was sufficient to prove Defendant's guilt beyond a reasonable doubt. The jury rejected the hypothesis of innocence advanced by Defendant, i.e., that V.K. sustained her injury by "plopping" down on some bricks while playing outside. Under the the facts of the case, including Defendant's statement, the significant bruising sustained by V.K., and Defendant's internet searches regarding spanking, abuse, and the injuries resulting therefrom, there was not another hypothesis that raised a reasonable doubt. As stated in *Mack*, there is not an alternative hypothesis that makes it sufficiently reasonable that a rational juror could not have found proof of either cruelty to a juvenile or attempted cruelty to a juvenile beyond a reasonable doubt in this case. Accordingly, Defendant's assignment of error that the evidence presented by the State was insufficient to convict her of attempted cruelty to a juvenile has no merit.

*Improper Venue Assignment of Error*

The argument supporting Defendant's second assignment of error consists of a single sentence. Appellate counsel contends she was unable to locate testimony that the crime occurred in the parish of prosecution. Louisiana Code of Criminal Procedure Article 615 provides:

> Improper venue shall be raised in advance of trial by motion to quash, and shall be tried by the judge alone. Venue shall not be considered an essential element to be proven by the state at trial, rather it shall be a jurisdictional matter to be proven by the state by a preponderance of the evidence and decided by the court in advance of trial.

Thus, the State was not required to prove venue as an essential element. Additionally, we note in the video of Defendant's interview at the sheriff's department she stated her home was located in DeRidder. As discussed above, the

incident in question occurred at Defendant's home, and V.K.'s mother reported the incident to the Beauregard Parish Sheriff's Office, the parish of prosecution. This assignment of error has no merit.

***Errors Patent***

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find there are three errors patent, and the minutes of sentencing require correction.

First, when the trial court placed Defendant on supervised probation for five years, it exceeded the period of probation allowed by La.Code Crim.P. art. 893(A)(1)(a). In 2017, the legislature amended La.Code Crim.P. art. 893 to change the probationary period for most offenses from a maximum of five years to a maximum of three years. 2017 La. Acts 280, § 1.[1] The legislature allowed for a maximum five-year probationary period for some offenses–a first conviction for La.R.S. 14:81.1 and La.R.S. 14:81.2, and certain offenses designated as crimes of violence in the court minutes pursuant to La.Code Crim.P. art. 890.3. La.Code Crim.P. art. 893(A)(1)(b) and (A)(2). Although attempted cruelty to a juvenile arguably meets the definition of a crime of violence provided in La.R.S. 14:2(B), it is not one of the enumerated crimes of violence in La.R.S. 14:2(B), and, more importantly, it was not designated as a crime of violence in the court minutes. Additionally, neither attempted cruelty to a juvenile nor the completed offense of cruelty to a juvenile are enumerated in La.Code Crim.P. art. 890.3(C) as a crime that

---

[1] In the 2024 Second Extraordinary Session, the legislature changed the maximum probationary period back to five years. 2024 La. 2nd Ex. Sess. Acts No. 8, § 1. Section 4 of Act 8 states, "The provisions of this Act shall only apply to offenses committed on or after August 1, 2024." The history of amendments at the end of La.Code Crim.P. art. 893 indicates the effective date of Act 8 was April 29, 2024, which was the general effective date of laws enacted during the 2024 Second Extraordinary Session. Defendant's offense was committed on February 28, 2024. Thus, under either the "effective" date or the "application" date, Act No. 8 does not apply to Defendant.

14

"shall always be designated by the court in the minutes as a crime of violence." La.Code Crim.P. art. 890.3(C).

Since the offense in the present case does not fall within any of the exceptions to the maximum three-year probationary period set forth in La.Code Crim.P. art. 893, the probationary period in this case should not have exceeded three years. *See State v. McKinney*, 21-721 (La.App. 3 Cir. 4/6/22), 337 So.3d 931. In that case, this court instructed the trial court that if any portion of McKinney's sentence were suspended, the probationary period "shall not exceed three years in accordance with La.Code Crim.P. art. 893." *Id.* at 937.

In *State v. Lachney*, 24-170 (La.App. 5 Cir. 12/30/24), 410 So.3d 363, the fifth circuit cited *McKinney* in its determination that the probationary period should not have exceeded three years. Finding the error required resentencing, the fifth circuit stated:

> An appellate court is authorized to correct an illegal sentence pursuant to [La.Code Crim.P.] art. 882 A, when the sentence does not involve the exercise of sentencing discretion by the trial court. See *State v. Haynes*, 04-1893 (La. 12/10/04), 889 So.2d 224 (*per curiam*). Unfortunately, we find correction of this error involves the sentencing discretion of the trial court, and therefore, this court is unable to amend defendant's sentence. Further, the several requirements of [La.Code Crim.P.] arts. 895 J and 894.2 C & D can also be satisfied. Accordingly, defendant's sentence on count two is vacated, and this case is remanded for resentencing in compliance with this court's instructions as stated herein.

*Lachney*, 410 So.3d at 374.

Likewise, we find the trial court's imposition of an illegally excessive probationary period requires the sentence in the present case be vacated and the matter remanded for resentencing. The trial court is instructed that any suspension of sentence and probation imposed must be in accordance with the version of La.Code Crim.P. art. 893 in effect at the time the offense was committed, February 28, 2024.

15

Second, we find the $1,000.00 fine imposed by the trial court was illegally excessive. The penalty provision for the completed offense of cruelty to juveniles is set forth in La.R.S. 14:93(D), and provides:

> (1) Whoever commits the crime of cruelty to juveniles shall be fined not more than one thousand dollars or imprisoned with or without hard labor for not more than ten years, or both.

> (2) Notwithstanding the provisions of Paragraph (1) of this Subsection, whoever commits the crime of cruelty to juveniles as defined in Paragraph (A)(1) of this Section when the victim is eight years old or younger shall be imprisoned at hard labor for not more than twenty years.

Since Defendant was convicted of attempted cruelty to a juvenile, she could be sentenced to only one-half of the largest fine and/or only one-half of the longest term of imprisonment. La.R.S. 14:27(D)(3). Thus, the maximum fine that could have been imposed was $500.00. Accordingly, the trial court should be instructed that if a fine is imposed as part of Defendant's sentence, it cannot exceed $500.00.

Third, there is an error patent involving the trial court's imposition of financial obligations upon Defendant without holding a hearing in compliance with La.Code Crim.P. art. 875.1. Effective August 1, 2022, La.Code Crim.P. art. 875.1 required the following, in pertinent part:

> [P]rior to ordering the imposition or enforcement of any financial obligations as defined by this Article, the court shall conduct a hearing to determine whether payment in full of the aggregate amount of all the financial obligations to be imposed upon the defendant would cause substantial financial hardship to the defendant or his dependents.

Recently, this court in *State v. Portalis*, 23-395, p. 8 (La.App. 3 Cir. 12/6/23), 375 So.3d 1113, 1121, addressed this type of error as follows:

> Paragraphs B and G of 875.1 make it clear that the article applies to *any* fine, fee, cost, restitution, or other monetary obligation imposed as part of a criminal sentence or as a condition of parole or probation in a felony case. If the court determines that a substantial financial hardship would be created on either the defendant or his dependents, it can waive all or any portion of the obligation (we note that the victim must consent when restitution is involved) and order a monthly

16

payment plan, half of which must be distributed toward a restitution obligation, if such were imposed. No such hearing was conducted in the present case. Since we are vacating both sentences in this case and remanding the matters for resentencing, we instruct the trial court to comply with the provisions of La.Code Crim.P. art. 875.1 should any financial obligations be imposed upon Defendant at her resentencing.

Likewise, upon resentencing in the present case, the trial court is instructed to comply with the provisions of Article 875.1 should any financial obligations be imposed upon Defendant at her resentencing.

Finally, the minutes of sentencing require correction. The minutes indicate the trial court imposed a $1,000.00 fine and costs as conditions of probation. However, according to the transcript, the fine and costs were imposed as part of the principal sentence, not as conditions of probation. The minutes also indicate the trial court ordered Defendant's sentence to run consecutively to any other unserved sentence. The transcript, however, does not state such. "[W]hen the minutes and the transcript conflict, the transcript prevails." *State v. Wommack*, 00-137, p. 4 (La.App. 3 Cir. 6/7/00), 770 So.2d 365, 369, *writ denied*, 00-2051 (La. 9/21/01), 797 So.2d 62. Accordingly, the trial court is instructed to amend the minutes of sentencing to correctly reflect that the $1,000.00 fine and costs were imposed as part of Defendant's principal sentence, not as conditions of probation. Additionally, the trial court should be instructed to delete the statement in the minutes of sentencing that the trial court ordered Defendant's sentence to run consecutively to any unserved sentence.[2]

## **DECREE**

For the foregoing reasons, Defendant's conviction is affirmed. Defendant's sentence is vacated and the matter remanded for resentencing. The trial court is

---

[2] Because the court minutes are part of the record, they should be corrected even though this court is remanding the case for resentencing.

instructed that any suspension of sentence and probation must be imposed in accordance with the version of La.Code Crim.P. art. 893 in effect at the time the offense was committed, February 28, 2024. The trial court is further instructed that if a fine is imposed as part of the principal sentence, it cannot exceed $500.00. Additionally, the trial court is instructed to comply with the provisions of La.Code Crim.P. art. 875.1 should any financial obligations be imposed upon Defendant at her resentencing. Lastly, the trial court is instructed to amend the minutes of sentencing to correctly reflect that the $1,000.00 fine and costs were imposed as part of Defendant's principal sentence, not as conditions of probation, and instructed to delete the statement in the minutes of sentencing that the trial court ordered Defendant's sentence to run consecutively to any unserved sentence.

**CONVICTION AFFIRMED; SENTENCE VACATED; REMANDED WITH INSTRUCTIONS.**